## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**CALLIDUS CAPITAL**
**CORPORATION**

      **Plaintiff,**

**v.**　　　　　　　　　　　　　　　**Civil Action No. 1:14-cv-00270**

**ESCO MARINE, INC., ESCO**
**METALS, LLC, ESCO SHREDDING,**
**LLC, TEXAS BEST RECYCLING,**
**LLC, TEXAS BEST EQUIPMENT,**
**LLC, RICHARD JAROSS, EMJ**
**HOLDINGS, LLC, ELKA JAROSS,**
**ANDREW LEVY, REDSTONE**
**CAPITAL CORP., ALBERTO**
**GARCIA, and JOHN KRISTOPHER**
**WOOD,**

      **Defendants.**

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
## <u>AND PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ............................................................. 1

II.    FACTUAL BACKGROUND ............................................................. 2

    A.   The Loan And Security Documents ............................................. 3

    B.   Esco's Continuing Financial Struggles ......................................... 5

    C.   Esco And Its Management's Theft Of Collateral .............................. 8

III.    ARGUMENTS AND AUTHORITIES ............................................... 11

    A.   Callidus Has A Substantial Likelihood Of Success On The Merits. ................ 12

        *i.   Esco Breached The Loan Agreement.* ...................................... 13

        *ii.   Esco And Its Management Have Converted Callidus' Property.* ............. 14

        *iii.   Esco And Its Management Have Stolen Callidus' Property And Are Liable Under The Texas Theft Liability Act.* ...................................... 15

    B.   Callidus Will Suffer Irreparable Injury Unless This Court Grants Injunctive Relief. ...... 16

    C.   The Harm To Callidus Far Outweighs Any Harm To Esco That Might Result From Injunctive Relief ...................................................... 20

    D.   Granting Injunctive Relief Serves The Public Interest. .................................. 22

    E.   A Bond Is Not Required In The Fifth Circuit And Should Be Nominal At Most. ........... 23

IV.    CONCLUSION AND PRAYER ................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,
   577 F.3d 250 (5th Cir. 2009) ...............................................11

*Bryum v. Landreth*,
   566 F.3d 442 (5th Cir. 2009) ...............................................12

*Canal Auth. of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ...............................................12

*Cashman Equip. Corp. v. Beoufway Contractors, L.L.C.*,
   No. 07-3829, 2007 WL 3124704 (E.D. La. Oct. 24, 2007) ...................18

*Citizens Sav. Bank. v. GLI Tech. Servs., Inc.*,
   No. 96-2307, 1996 WL 737008 (E.D. La. Dec. 23, 1996) ...................18

*Collins v. Aggreko, Inc.*,
   884 F.Supp. 450 (D. Utah 1995)...........................................17

*Compact Van. Equip. Co., Inc. v. Leggett & Platt, Inc.*,
   566 F.2d 952 (5th Cir. 1978) ...............................................12

*Crutcher v. Cont'l Nat'l Bank*,
   884 S.W.2d 884 (Tex. App.—El Paso 1994, writ denied)....................15

*FUNimation Entm't v. SC Films Int'l, Inc.*,
   Case No. 4:13-cv-329, 2013 WL 5770383 (E.D. Tex. Oct. 24, 2013) ...............23

*Gen. Elec. Capital Corp. v. Deer Valley Trucking, Inc.*,
   No. 4:14-cv-150, 2014 WL 6686731 (D.N.D. Nov. 26, 2014).........................20, 22

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   119 S. Ct. 1961 (1999)....................................................12

*III Fin. Ltd., v. The Aegis Consumer Funding Grp., Inc.*,
   No. 99 CIV. 2579(DC), 1999 WL 461808 (S.D.N.Y. July 2, 1999) .....................17

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ...............................................11, 13, 16

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ...............................................23

*Keszler v. Mem'l Med. Ctr. of E. Tex.*,
   105 S.W.3d 122 (Tex. App.—Corpus Christi 2003, no pet.) .................13

**TABLE OF AUTHORITIES**
**(continued)**

*Kredietbank N.V. v. Morris*,
    No. 84-1903, 1985 WL 25625 (D.N.J. Oct. 11, 1985) ............................................18

*Lopez v. Lopez*,
    271 S.W.3d 780 (Tex. App.—Waco 2008, no pet).................................................14

*Marine Midland Trust Co. v. Alleghany Corp.*,
    28 F. Supp. 680 (S.D.N.Y. 1939) ......................................................................22

*Matrix Partners VIII, LLP v. Natural Res. Recovery, Inc.*,
    No. 1:08-CV-547, 2009 WL 175132 (E.D. Tex. Jan. 23, 2009) ...........................12

*Morales v. City of S. Padre Island*,
    Civil Action No. B-10-76, 2010 WL 2292042 (S.D. Tex. June 4, 2010)...............11

*Oyster Techs., Ltd. v. Envtl. Developers Grp., LLC*,
    Civil Action No. 1:11-cv-11795-JLT,
    2011 WL 6213747 (D. Mass. Dec. 13, 2011) ......................................................19

*Pipkin v. JVM Operating, L.C.*,
    197 B.R. 47 (E.D. Tex. 1996) ...........................................................................17

*Plainfield Specialty Holdings II Inc., v. Children's Legal Servs. PLLC*,
    634 F. Supp. 2d 833 (E.D. Mich. 2009)................................................18, 19, 20, 21, 22, 23

*Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980) ...........................................................................17

*State of Tex. v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) .......................................................................11, 13

*State v. Sw. Bell Tel. Co.*,
    526 S.W.2d 526 (Tex. 1975)..............................................................................18

*Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*,
    782 S.W.2d 223 (Tex. App. Houston [1st Dist.] 1989, no writ)............................20

*TGI Friday's Inc., v. Great Nw. Restaurants, Inc.*,
    652 F. Supp. 2d 763 (N.D. Tex. 2009) ...............................................................14

*Tocco v. Tocco*,
    409 F. Supp. 2d 816 (E.D. Mich. 2005)..............................................................18

*Watkins v. City of Arlington*,
    Civil Action No. 4:14-cv-381-O,
    2014 WL 3408040 (N.D. Tex. July 14, 2014) ......................................................23

## TABLE OF AUTHORITIES
### (continued)

*Wenner v. Tex. Lottery Comm'n,*
  123 F.3d 321 (5th Cir. 1997) ................................................................21

**STATUTES**

Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001-005 .............................15, 16

Tex. Pen. Code § 31.03 ..............................................................................16

**RULES**

Fed. R. Civ. P. 34 ......................................................................................24

Fed. R. Civ. P. 65 .........................................................................1, 11, 23

**TREATISES**

11A Charles Alan Wright & Arthur R. Miller,
  Federal Practice and Procedure § 2948.3 (2d ed. 1995) ........................12

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff Callidus Capital Corporation ("Callidus") respectfully requests that the Court issue a temporary restraining order and preliminary injunction against Defendants Esco Marine, Inc., Esco Metals, LLC, Esco Shredding, LLC, Texas Best Recycling, LLC, and Texas Best Equipment, LLC (collectively, "Esco") and Defendants Richard Jaross, Andrew Levy, Alberto Garcia, and John Kristopher Wood (collectively, with Esco, "Esco and its Management") as follows:

## I.    SUMMARY OF ARGUMENT

1.      Callidus filed this action to collect the $31.3 million presently due under loans made to Esco.  By this motion, Callidus seeks immediate status quo injunctive relief because, as they have admitted in writing and verbally, Defendants are engaged in continuous misappropriation and theft of collateral (principally inventory and customer payments) irreparably harming Callidus.

2.      By June 2014, Esco was in extreme financial and operational distress and sought and received from Callidus financing to maintain operations as Esco sought a buyer for the business.  Callidus specializes in short term loans to distressed companies and, given the condition of its borrowers, Callidus' loans are offered with specialized covenants protecting the loan, and with interest rates and fees that are higher than those of traditional bank lenders.  For example, among the specialized covenants applicable to distressed borrowers, in lieu of financial covenants Callidus expressly is authorized to call the loan at any time without borrower default.

3.      The Loan Agreement requires Esco to deposit all income from all sources into a "Blocked Account" maintained at an independent financial institution (here, Wells Fargo).  To emphasize, all funds received from any source must be deposited in the Blocked Account—including cash sales, accounts receivable payments, credit card payments, shareholder

investments, and tax refunds.  Wells Fargo transfers those funds to Callidus, which applies those amounts to Esco's indebtedness.  Callidus then measures Esco's borrowing base as the basis for further advances under the credit facility from which Esco funds ongoing vessel scrapping operations.

4.  As detailed in the Complaint, by October 2014, Esco defaulted.  Most significantly for this motion, Esco began selling collateral and directly collecting customer payments and diverting those funds into its own account rather than depositing them in the Blocked Account.  Defendants now have admitted all of this, but have attempted to conceal the extent of the theft and conversion by failing and refusing to provide Callidus with the daily, weekly, and monthly detailed financial reports that the loan documents require.

5.  Based upon this brazen and willful misconduct, Callidus seeks a Court order immediately requiring Defendants to comply with the loan covenants regarding the Blocked Account and the required financial reporting.  Because of management's theft of collateral and dishonesty, Callidus further requests that the Court immediately appoint Duff & Phelps as a custodian/monitor to ensure Defendants' compliance with this Court's order.

## II.  FACTUAL BACKGROUND[1]

6.  Esco operates a marine yard and recycling operation.  Its business involves dismantling and selling aged maritime vessels at a scrapyard located in Brownsville, Texas. Currently, Esco is undertaking scrapping operations relative to the aircraft carrier USS Saratoga.

7.  Callidus is a company based in Toronto, Ontario.  It offers financing solutions to companies that are unable to obtain adequate financing from conventional or traditional lending institutions.  Due to its precarious financial situation, including financial covenant defaults with

---

[1] The facts in this motion are supported by the Declaration of Craig L. Boyer, attached as Exhibit A. Additional exhibits in this motion are attached to the Declaration as Exhibits A-1 through A-31.

its prior lender, SIMS Metal Management, Esco required non-conventional lending, which Callidus was willing to provide.  *See* Esco Marine, Inc. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report for December 31, 2013 and 2012, attached as Exhibit A-9, at 19.

        A.      <u>**The Loan And Security Documents**</u>

       8.      On June 30, 2014, Callidus agreed to loan a maximum of $33,990,000 to Esco under a series of loan documents.  The loan documents included a Loan Agreement, attached as Exhibit A-1; Guaranty of Richard Jaross, Elsa Jaross, and EMJ Holdings, LLC, jointly and severally, attached as Exhibit A-2; Guaranty of Andrew Levy and Redstone Capital Corp., jointly and severally, attached as Exhibit A-3; Security Agreement, attached as Exhibit A-4; Deed of Trust, attached as Exhibit A-5; Leasehold Deeds of Trust, attached as Exhibit A-6; and Demand Facility Notes, attached as Exhibit A-7.  The Loan Agreement was subsequently amended on October 16, 2014, in the First Amendment to Loan Agreement ("First Amendment"), attached as Exhibit A-8.  Exhibits A-1 through A-8 are collectively referred to as the "Loan and Security Documents."

       9.      Due to the risk that Esco's financial condition posed, the Loan and Security Documents contain a number of protections for Callidus.  For example:

- All advances are conditioned on the absence of a default and the satisfaction of extensive conditions precedent.  Loan Agreement, Ex. A-1, §§ 1(v) (definition of "Effective Date"), 4(b), 5, 15(a), 15(b).

- Advances under Facility A, the revolving credit facility, require an adequate borrowing base of collateral, and all calculations of availability for lending under Facility A are in the Lender's "sole discretion."  *Id*. §§ 3, 4(c).  Any shortfalls in the borrowing base require a payment to rectify the shortfall.  *Id*. § 10(a).

- Callidus' lending is explicitly "discretionary" and subject to reserves "determined by the lender in its sole discretion."  *Id*. § 3(m); First Amendment, Ex. A-8, § 6.1.

3

- Reflecting the discretionary nature of the lending, Callidus has the right to demand payment in full of all advances at any time, and failure to make payment on demand is an Event of Default.  Loan Agreement, Ex. A-1, §§ 7, 23(a).

- Esco is subject to numerous covenants, including the obligation to enter into and implement a metals commodity hedging program acceptable to Callidus and overseen by Duff & Phelps.  *Id*. § 19(a)(xii).  The hedging program was intended to mitigate Callidus' lending risk because a principal part of Esco's business was selling metal obtained from retired vessels.

10.  A critical protection for Callidus in the Loan and Security Documents to maintain its security interests is the way in which Esco is required to manage funds.  Esco was required to establish a "Blocked Account" into which it is obligated to "promptly deposit all funds received from all sources including, without limitation, all account receivable payments, cash sales receipts, credit card payments, any and all refunds received from any source whatsoever and any proceeds of any advances or other loans made to it."  Loan Agreement, Ex. A-1, § 16(a).  Esco is further obligated to "direct its account debtors that remit payments by electronic funds transfers to remit all payments directly into the Blocked Account" and "direct all Account Debtors to deposit Accounts solely into the Blocked Account."  *Id*.

11.  All property in the Blocked Account is property of Callidus.  *Id*. § 16(b).  "[I]mmediately upon receipt" of any funds by Esco or its officers, employees, agents, directors or other persons, such funds must be deposited in the Blocked Account.  *Id*. § 16(c).  Esco agreed that "[i]n no event shall the same be commingled with any of the Borrower's own funds."  *Id*.  If Esco fails to "deposit funds from any source into the Blocked Account or deposits any funds from any source into an account other than the Blocked Account," it is a specific event of default.  *Id*. § 23(e).

12.  During the negotiations for the loan, Callidus advised Esco and its Management on multiple occasions that Callidus would not tolerate any violation of the Blocked Account requirements.  Shortly after the loan was closed, Esco made a deposit into its own account, and

Callidus immediately instructed an Esco employee, Defendant Alberto Garcia, that this would not be tolerated.

13.     The financial institution at which the Blocked Account is maintained, Wells Fargo, is required to, "on a daily basis," transfer all funds received or deposited into the Blocked Account to Callidus' account.  *Id*. § 16(b).  The amounts Callidus receives are applied to the outstanding loan balance.  *Id*. § 16(d).

14.     As a condition to lending, each borrower must establish "Disbursement Accounts."  *Id*. § 15(a)(ii).  Callidus advances funds to the Disbursement Accounts, *id*. §§ 4(a), 15(b), and Esco is required to make all of its payments and disbursements from the Disbursement Accounts.  *Id*. § 16(e).

15.     Transparency as to Esco's financial condition and the state of the collateral is also a critical component of the Loan and Security Documents.  Esco is required to deliver to Callidus daily, weekly, monthly, and annual reporting, signed by a senior officer, on various pieces of financial information.  *Id*. § 20.  Esco is also required to provide a "Weekly Borrowing Base Report" listing the amount of Esco's assets that were part of the collateral securing the loan and other information pertinent to Callidus' calculation of the loan amount available to Esco.  *Id*. § 3.

**B.**      **Esco's Continuing Financial Struggles**

16.     Despite Esco's failure to comply with several conditions precedent, Callidus loaned Esco approximately $22 million on June 30, 2014.  *See* Callidus Statements As Of July 2, 2014, attached as Exhibit A-10.  On that date, Callidus extended to Esco the full amount of Facilities B, C, and D, and virtually the full amount of Facility E.  *Id*.  At that time, Callidus also loaned Esco over $4.6 million under Facility A.  *Id*.  At this juncture, as set forth in greater detail below, Esco owes Callidus $31,316,346.92 in connection with the loan.

5

17.     On August 27, 2014, less than two months from the loan closing, Esco provided projections forecasting that it would need to borrow more than the maximum amount permitted under Facility A and that it would have a significant borrowing base shortfall for that proposed borrowing.  Duff & Phelps Memorandum (Aug. 27, 2014), attached as Exhibit A-11, at Appendix A.  It also projected significant net losses and increasingly negative equity values on its balance sheet.  *Id*. at Appendix A.

18.     In mid-October 2014, the parties discussed an amendment to the Loan Agreement that would permit Esco to shift $1 million of its borrowings from Facility A (the revolving line of credit) to Facility F.  *See* E-mail from Kris Wood (Oct. 15, 2014), attached as Exhibit A-12.  At the time, Esco explained that it needed additional funds to pay $1.67 million in accounts payable that were aged more than sixty days ($1.436 million of which were aged over ninety days), much of which was owed to vendors "critical" to operations.  *Id*.  While the terms of the First Amendment differ from those Esco sought, Callidus agreed to a First Amendment to fund $1,111,208.85 under Facility F for costs related to towing the USS Saratoga, such amount to be immediately applied to pay down Facility A.  First Amendment, Ex. A-8, § 2.1.  This allowed Esco to resolve the shortfall in the borrowing base availability under Facility A.  *See* E-mails Between Kris Wood and Nhan Tri Vu (Oct. 17, 2014), attached as Exhibit A-13.

19.     Prior to the First Amendment, Esco had complained about Callidus not extending additional credit to Esco.  While these complaints were contrary to the Loan and Security Documents, Callidus sought to end these assertions.  In the First Amendment, Esco confirmed that releases of funds were "discretionary by Lender" and that this was a "discretionary loan."  First Amendment, Ex. A-8, §§ 2.1, 6.1.  Further, Esco released any and all claims it may have had prior to the date of the First Amendment.  *Id*. § 6.1.

20.     On the same day that the First Amendment was executed—more than five months after the deadline for doing so [*see* Loan Agreement, Ex. A-1, § 20(l)]—Esco delivered to Callidus its audited financial statements for the year ending December 31, 2013.  *See* E-mail from Kris Wood (Oct. 16, 2014), attached as Exhibit A-14.  The auditor's report contained a "going concern" qualification:

> The accompanying consolidated financing statements have been prepared assuming that the Company will continue as a going concern.  As discussed in Note Q to the consolidated financial statements, the Company has suffered significant losses from operations, negative cash flows from operations, negative working capital, a net capital deficiency and defaulted on certain covenants of its loan agreements that raise substantial doubt about its ability to continue as a going concern.

Esco Marine, Inc. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report for December 31, 2013 and 2012, attached as Exhibit A-9, at 3.

21.     In late October 2014 and early November 2014, Callidus requested the status of Esco's implementation of a hedging program, which was required to be in place by the end of July 2014.  *See* Loan Agreement, Ex. A-1, § 19(a)(xii).  Esco first responded that it could not finance margin payments for a hedging program due to its financial condition.  *See* E-mail from Kris Wood (Oct. 28, 2014), attached as Exhibit A-15.  Later, Esco stated that it was negotiating with a prospective buyer of the business, and the buyer was not in favor of a hedging program. *See* E-mail from Kris Wood (Nov. 5, 2014), attached as Exhibit A-16.

22.     In the face of Esco's breach of the hedging program covenant, and failures to satisfy conditions precedent to further loans, Esco asked Callidus to extend additional loans.  *See* E-mail from Kris Wood (Oct. 28, 2014), Ex. A-15.  Esco audaciously protested that negative borrowing base availability should not impede its requests for further credit.  *See* E-mail from Kris Wood (Nov. 6, 2014), attached as Exhibit A-17; *see also* E-Mail from Kris Wood (Nov. 11, 2014), attached as Exhibit A-18.

23.     On November 7, 2014, Esco noted that it was "currently struggling to keep [its] key vendors servicing [its] account."  E-mail from Kris Wood (Nov. 7, 2014), attached as Exhibit A-19.  While declaring that its shareholders would not inject additional capital, Esco complained that Callidus should provide additional funds.  *Id*.  Esco asserted that additional credit was mandated by the First Amendment, notwithstanding the clear language of the First Amendment and the other Loan and Security Documents to the contrary.  Esco claimed that without additional credit it would not be able to pay "vendors which are integral to Esco's operations" and that Esco would "be forced to shut down operations."  *Id*.

C.     <u>Esco And Its Management's Theft Of Collateral</u>

24.     On November 11, 2014, Callidus discovered that, beginning on October 31, 2014 and continuing into November, Esco had received payments from customers into its Disbursement Accounts without remitting the money to the Blocked Account.  *See* E-mail from Nahn Tri Vu (Nov. 11, 2014), attached as Exhibit A-20.  Callidus demanded an explanation and reiterated that "all money received, from all sources, must be deposited into the Callidus [B]locked [A]ccount."  *Id*.  Defendant Alberto Garcia initially responded that he would work on the issue.  *See* E-mail from Alberto Garcia (Nov. 12, 2014), attached as Exhibit A-21.  But that same day, another illicit deposit was made to the Disbursement Accounts, bringing the total of misappropriated collateral then to $368,000.  *See* E-mail from Nhan Tri Vu (Nov. 13, 2014), attached as Exhibit A-22.

25.     Upon receiving the report of this misconduct, the Callidus officer principally responsible for the Esco loan forwarded the information to Defendants Andrew Levy, Kris Wood, and Alberto Garcia indicating that if Esco had in fact diverted funds away from the Blocked Account, Esco "has a major problem with Callidus."  Email from Craig Boyer (Nov. 13, 2014), attached as Exhibit A-23. Mr. Levy responded, and did not deny the diversion

8

but instead implicitly admitted it, indicating that "[c]ritical things . . . need to be paid" and without resolution "we will have to shut the Company down."   Email from Andrew Levy (Nov. 13, 2014), attached as Exhibit A-24.   Mr. Wood also admitted the diversion, saying that the funds were used to cover payroll and critical payments required to maintain operations.   *See* Email from Kris Wood (Dec. 2, 2014), attached as Exhibit A-25.

26.   Callidus asked Duff & Phelps, a company appointed for consulting obligations under the Loan and Security Documents (*see* Loan Agreement, Ex. A-1, § 15(a)(iv)), to visit Esco's offices on November 19-21, 2014 to investigate the issue.   Duff & Phelps reported that:

- Esco acknowledged that a member or members of management contacted customers at the end of October, 2014 to direct them to remit payment to the Disbursement Accounts instead of the Blocked Account.

- Esco directly had deposited customer payments totaling $653,237 into the Disbursement Accounts rather than the Blocked Account.

- Esco reported that it intended to advise customers to deposit into the Disbursement Accounts and intended to continue to use these monies to fund expenses that Esco determined to be critical, including payroll.

Duff & Phelps Memorandum (Nov. 26, 2014), attached as Exhibit A-26.

27.   Esco's account records demonstrate Esco's beach of the Blocked Account provisions as admitted to Duff & Phelps.   These records establish that customers that once made multiple wire transfer direct deposits into the Blocked Account now altered their behavior to make deposits into Esco's Disbursement Accounts, and Esco did not deposit those funds into the Blocked Account.   These customers include, but are not limited to, Perfiles Comerciales, Thalheimer Brothers, and Newell Recycling Ltd.

28.   Callidus demanded return of the stolen collateral, but Esco continued its unlawful theft of collateral.   During November, Esco received $1,291,085.42 in deposits into the Disbursement Accounts that were not transferred to the Blocked Account.   *See* Reconciliation of

Disbursement Account Transactions for November 2014, attached as Exhibit A-27. In that month, there were four customer deposits made into the Blocked Account totaling $459,589.87. During December, Esco received $2,950,404.80 into the Disbursement Accounts that was not transferred to the Blocked Account. *See* Reconciliation of Disbursement Account Transactions for December 2014, attached as Exhibit A-28.[2] Only one customer made a direct deposit during December into the Blocked Account, in the amount of $9,202.80.

29.     Esco also has failed to provide critical reports that the Loan and Security Documents require. For example, Esco has not provided the Weekly Borrowing Base Report since December 7, 2014. As of December 7, Esco exceeded the $10 million loan limit on Facility A, and Esco had a deficit in borrowing base availability of $1.4 million. *See* December 7, 2014 Weekly Borrowing Base Report, attached as Exhibit A-29. Esco only provided September reports on December 3, 2014. It provided October reports on December 31, 2014 (over a month late), and only after professional courtesy copies of the Complaint (as filed) were faxed and emailed to Defendants and their counsel. Esco has not provided any further reports as required by the Loan and Security Documents.

30.     Faced with the theft of its collateral, a lack of reporting, a shortfall in collateral that worsens with each misappropriation, and a defaulting borrower in dire financial condition that refuses to take necessary corrective action, Callidus filed this suit on December 30, 2014. As of December 31, 2014, Esco owes: (1) $11,552,730.07 under Facility A; (2) $1,170,000.00 under Facility B; (3) $6,225,000.00 under Facility C; (4) $4,740,000.00 under Facility D; (5) $4,650,000.00 under Facility E; (6) $888,966.85 under Facility F; (7) facility fee of

---

[2] The November and December Reconciliations summarize voluminous bank account statements for the Disbursement Accounts for these periods, which can be provided to the Court upon request.

$509,850.00; (8) amendment fee of $900,000.00; and (9) prepayment fee of $679,800.00.   In total, Esco owes Callidus at least $31,316,346.92.   *See* Callidus Statements As Of January 2, 2015, attached as Exhibit A-30.

## III.   ARGUMENTS AND AUTHORITIES

31.     Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders.  The same standards apply to both types of relief.  *See Morales v. City of S. Padre Island*, Civil Action No. B-10-76, 2010 WL 2292042, at *2 (S.D. Tex. June 4, 2010).  The party seeking injunctive relief must show "'(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.'" *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (internal quotation marks and citation omitted).

32.     Preliminary injunctive relief is "an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."  *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (international quotation marks omitted).  That said, "none of the four prerequisites has a fixed quantitative value.  Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."  *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).  And the ultimate decision to grant a temporary restraining order or a preliminary injunction rests with the sound discretion of the district court.  *See, e.g.*, *Bluefield Water Ass'n, Inc.*, 577 F.3d at 253.  These remedies, therefore, "may be issued to protect the moving party from irreparable injury and to preserve the power of the trial court to render a meaningful

decision on the merits." *Compact Van. Equip. Co., Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978).

33.     Here, Esco's blatant, ongoing, and admitted breach of its responsibilities under the Loan Agreement *and* Esco and its Management's open and notorious conversion and theft of Callidus' property mandate injunctive relief to preserve the status quo prior to trial.  *Accord Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo.").  Although Callidus need not prove its case at this early stage, its claims against Esco and its Management will be successful, and Callidus will be irreparably harmed absent this Court's injunctive relief.  Esco and its Management are dissipating the collateral securing Callidus' loan in flagrant violation of specific prohibitions in the Loan Agreement.  This harm outweighs any "harm" Esco might experience by being forced to satisfy its pre-existing commitments to Callidus.  And the grant of preliminary relief will not disserve the public, which has a keen interest in upholding the rights of secured parties in today's credit-driven economy.[3]

### A.     Callidus Has A Substantial Likelihood Of Success On The Merits.

34.     To satisfy this first element, Callidus "is not required to prove [its] entitlement to summary judgment." *Bryum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima face case but need not show that he is certain to win." (footnote omitted)).  This factor, therefore, "is more negative than positive:  one

---

[3] The Supreme Court's limitation on injunctive relief in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 119 S. Ct. 1961 (1999) does not apply.  Courts "have interpreted *Grupo Mexicano* narrowly so as to apply its holding only to actions asserting *solely* legal causes of action or actions involving assets in which *no lien* or other equitable interests in the assets is claimed."  *Matrix Partners VIII, LLP v. Natural Res. Recovery, Inc.*, No. 1:08-CV-547, 2009 WL 175132, at *4 (E.D. Tex. Jan. 23, 2009).

cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate." *Seatrain Int'l, S.A.*, 518 F.2d at 175. Here, the evidence confirms that Callidus has a substantial likelihood of success on the merits.

       *i.*    *Esco Breached The Loan Agreement.*

35.    Under Texas law,[4] "[t]he elements in a suit for breach of contract are:  (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Keszler v. Mem'l Med. Ctr. of E. Tex.*, 105 S.W.3d 122, 128 (Tex. App.—Corpus Christi 2003, no pet.).

36.    The Loan Agreement is a valid, binding contract that has been executed by authorized representatives of Callidus and Esco.  In accordance with the Loan Agreement, Callidus funded loans to Esco under Facility Loans A through F.  Despite Callidus' performance under this valid and binding agreement, Esco breached the Loan Agreement by refusing to place all funds received into the Blocked Account (which were to be swept to Callidus' account on a daily basis).  In addition, Esco has breached the Loan Agreement by (1) allowing the loans and advances to Esco under the line of credit to exceed the borrowing base; (2) failing to implement a metal commodity hedging program; and (3) failing to timely deliver financial reports requested by Callidus.

37.    Esco cannot dispute its breaches of the Loan Agreement.  Indeed, Esco has admitted that it has directed customers to remit payments to the Disbursement Accounts instead

---

[4] Courts assess the likelihood of success on the merits by looking to "standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (internal quotation marks omitted)).  The Loan Agreement provides that Texas law governs.  *See* Loan Agreement, Ex. A-1, § 30.

of the Blocked Account (as required by the Loan Agreement), that Esco "intends to continue to advise customers to deposit into the Disbursement Accounts," and that Esco "intends to continue to use these monies to fund expenses it determines to be critical, including payroll" instead of depositing funds into the Blocked Account as required by the Loan Agreement.  Duff & Phelps Memorandum, Ex. A-26, § 3.3, ¶ 4.  Furthermore, only two small deposits have been made into the Blocked Account since November 14, 2014, and Esco has not repaid the loan.  As a result of these willful and admittedly ongoing breaches of the Loan Agreement, Esco owes Callidus at least $31,316,346.92, plus Callidus' legal fees, costs, and expenses incurred in this dispute and in this litigation (under Loan Agreement § 22(a); Jaross Guaranty and Levy Guaranty §§ 4 and 10; and Security Agreement § 6.3).  Indeed, as indicated above, a default is not a precondition to Callidus calling the loan.

38.     Accordingly, Callidus has a high likelihood of success of proving its breach of contract claim.  This alone is sufficient to satisfy the first precondition to preliminary injunctive relief.  *See, e.g.*, *TGI Friday's Inc., v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009) ("The court need only consider whether *one* of [plaintiff's] claims . . . has a substantial likelihood of success." (emphasis added)).

   ii.     *Esco And Its Management Have Converted Callidus' Property.*

39.     Under Texas law, "[t]o establish conversion of personal property, a plaintiff must prove that:  (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; and (3) the plaintiff suffered injury."  *Lopez v. Lopez*, 271 S.W.3d 780, 784 (Tex. App.—Waco 2008, no pet).  Notably, a security interest can be converted if a party

wrongfully exercises dominion and control over collateral property.  *See, e.g.*, *Crutcher v. Cont'l Nat'l Bank*, 884 S.W.2d 884, 888 (Tex. App.—El Paso 1994, writ denied).

40.     By operation of the Loan Agreement, Plaintiff owned, and had the right of immediate possession of, the collateral and the proceeds from any sale of the collateral.  Indeed, when any collateral is sold, Sections 15(a)(iii) and 16 of the Loan Agreement require the proceeds of sale to be deposited in the Blocked Account.  Instead of doing as they are required, however, Esco and Its Management deposited the proceeds from sale of collateral into Disbursement Accounts and used the cash for working capital.  This is not only contrary to the purpose, structure, and requirements of the Loan Agreement, it is conversion under Texas law.  The proceeds of the sale of collateral are Callidus' identifiable, personal property that Esco and Its Management used without authorization for their own purposes to the exclusion of Callidus' rights as owner of the property to Callidus' significant detriment.

41.     To no avail, Callidus has demanded return of its collateral (customer payments and proceeds from the sale of Callidus' collateral).  As noted above, Esco's management has admitted that Esco has advised customers, and will continue to advise customers, to deposit funds into the Disbursement Accounts instead of the Blocked Account—acts that amount to conversion.  Accordingly, Callidus also has a high likelihood of success of proving its claim for conversion.

     *iii.*     *Esco And Its Management Have Stolen Callidus' Property And Are Liable Under The Texas Theft Liability Act.*

42.     The Texas Theft Liability Act ("TTLA"), Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001-005, provides a civil cause of action for victims of theft.  To prevail on a claim under the TTLA based on theft, a plaintiff must show (1) that the plaintiff had a possessory right to property; (2) that the defendant unlawfully appropriated, secured, or stole the plaintiff's property;

(3) that the unlawful taking was made with the intent to deprive the plaintiff of the property; and (4) that the plaintiff sustained damages as a result of the theft.  Tex. Civ. Prac. & Rem. Code §§ 134.002(2) (element 2), § 134.003 (element 2), § 134.005(a) (element 4); Tex. Pen. Code § 31.03(a), (b)(1), elements 1-3), § 31.04(a) (element 3).  If successful, the victim of theft can recover actual damages, statutory damages, court costs, and attorney's fees.  Tex. Civ. Prac. & Rem. Code § 134.005.

43.     Here, for substantially the same reasons outlined above with respect to the conversion claim, Callidus has a high likelihood of success proving a theft violation of Texas Penal Code § 31.03 and therefore, liability under the TTLA.  Esco and its Management have unlawfully appropriated and stolen collateral with the open and express intent to deprive Callidus of such property.

**B.     Callidus Will Suffer Irreparable Injury Unless This Court Grants Injunctive Relief.**

44.     To satisfy the second element of the temporary restraining order and temporary injunction standard, the plaintiff "must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result."  *Janvey*, 647 F.3d at 600.  "In general, harm is irreparable where there is no adequate remedy at law, such as monetary damages."  *Id*. That said, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"  *Id*.  For example, "where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds."  *Id*.  Thus, "even were [the plaintiff's] remedy limited to damages, an

16

injunction may issue to protect that remedy." *Productos Carnic, S.A. v. Cent. Am. Beef &*
*Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

45.     Callidus will be irreparably injured if this Court does not grant preliminary
injunctive relief.  Here, irreparable harm would result, first and foremost, because Esco is unable
to satisfy a money judgment of this magnitude.  *See, e.g.*,  *Pipkin v. JVM Operating, L.C.*, 197
B.R. 47, 56 (E.D. Tex. 1996) (citing, among others, *Collins v. Aggreko, Inc.*, 884 F.Supp. 450,
452 (D. Utah 1995) ("Irreparable harm could result if defendants will be unable to pay
damages . . . .")).   Unlike some parties who disingenuously invoke this measure of irreparable
harm, Callidus has presented substantial evidence of Esco's dire financial condition.   Esco's
independent auditors have issued a going concern qualification to the financial statements of the
company.   Esco's liabilities exceed the value of its assets, generating negative shareholder
equity.   Esco has been unable to pay trade creditors in the ordinary course, in many cases being
over ninety-days delinquent with key vendors.   Esco routinely has overdrawn the availability on
the revolving credit facility.   Esco's Management has stated on several occasions the imminent
risk of the company needing to shut down operations for lack of sufficient capital.   Accordingly,
unless the Court steps in to prevent Esco from further dissipating the collateral, there will be
nothing left that might even possibly satisfy Esco's obligations under the Loan Agreement.
These facts are sufficient to satisfy this prong of the analysis.  *See, e.g., III Fin. Ltd.*, *v. The Aegis*
*Consumer Funding Grp., Inc.*, No. 99 CIV. 2579(DC), 1999 WL 461808, at *6 (S.D.N.Y. July 2,
1999) (holding that "plaintiff has demonstrated a threat of irreparable harm based on the non-
recourse nature of the loans, coupled with the apparent inability of [the borrower] to satisfy an
eventual judgment in the event [the lender] ultimately prevails").

46.     Moreover, Callidus faces irreparable harm for an additional reason, namely the loss of its security interests.  "Where secured creditors (under the UCC or otherwise) seek court intervention to maintain their position, the prospective loss of their *status quo* security interest has been held sufficient to constitute the irreparable harm needed to justify an injunction." *Plainfield Specialty Holdings II Inc., v. Children's Legal Servs. PLLC*, 634 F. Supp. 2d 833, 846 (E.D. Mich. 2009) (citing *Tocco v. Tocco*, 409 F. Supp. 2d 816, 831-32 (E.D. Mich. 2005) (enjoining the defendant from transferring assets in which plaintiff had an interest in order to preserve the status quo); *Kredietbank N.V. v. Morris*, No. 84-1903, 1985 WL 25625, at *1 (D.N.J. Oct. 11, 1985) (observing that the court had previously granted an injunction requiring the borrower's receivables to be turned over to the lender pending resolution of the lawsuit); *Citizens Sav. Bank. v. GLI Tech. Servs., Inc.*, No. 96-2307, 1996 WL 737008, at *1 (E.D. La. Dec. 23, 1996) (denying the defendants' motion seeking to dissolve a preliminary injunction restraining defendants "from taking any action which would further diminish any assets in which [the plaintiff] maintains a valid and perfected security interest"); *Cashman Equip. Corp. v. Beoufway Contractors, L.L.C.*, No. 07-3829, 2007 WL 3124704, at *5 (E.D. La. Oct. 24, 2007) (enjoining disposition of property in which plaintiff had an ownership interest pending arbitration)).

47.     Importantly, the status quo to be protected here—and for which Callidus bargained—is defined by the Loan Agreement, which requires Esco to place all receipts in the Blocked Account.  *See, e.g.*, *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975) (defining "the status quo as being the last, actual, peaceable, non-contested status that preceded the pending controversy").  That is precisely the status quo that the Eastern District of Michigan ordered in a case with facts profoundly similar to those at issue here.  *See Plainfield Specialty*

*Holdings II Inc.,* 634 F. Supp. 2d at 836, 850 (granting preliminary injunction against defaulting borrower owing over $20 million to lender with perfected security interest in substantially all of borrower's personal property).    That court ordered defendants to "immediately, and continually . . . deposit *all funds* in which it has an interest . . . in to the lockbox account" and to "immediately notify all third parties . . . to hold all funds in which [d]efendants have or may have an interest, whether contingent or not, and demand that each of them transfer such funds to the [lockbox] account and otherwise not disburse any of the funds."   *Id*. at 849 (emphasis added). The foregoing relief is substantially similar to that requested by Callidus here.

48.    In addressing the irreparable-harm prong, the court reasoned that the plaintiff "has a security interest in certain assets which it seeks to preserve pending trial in this matter" and "there are reasons here to be concerned about the availability of the collateral absent an injunction."  *Id*. at 846.  Like here, the defendants in *Plainfield Specialty* "kept significant assets outside of the [lockbox] account and failed to reveal the existence of" over $3 million in proceeds that should have been deposited into the lockbox, among other funds.  *Id*.  The numbers at issue before this Court are just as staggering.  Other than two small deposits, Esco has made no deposits to the Blocked Account since November 14 while at the same time depositing over $3 million into its Disbursement Accounts.  As each act of theft occurs, Callidus will find itself less secured.  *See, e.g.*, *Oyster Techs., Ltd. v. Envtl. Developers Grp., LLC*, Civil Action No. 1:11-cv-11795-JLT, 2011 WL 6213747, at *2 (D. Mass. Dec. 13, 2011) ("It is clear that loss of a pledged security interest poses significant risk of irreparable harm to warrant a preliminary injunction.").  Accordingly, this prong weighs in favor of granting a temporary restraining order and a preliminary injunction.

### C.     The Harm To Callidus Far Outweighs Any Harm To Esco That Might Result From Injunctive Relief.

49.     Upon this Court's grant of preliminary injunctive relief, any hardship that may befall Esco is entirely of Esco's own making.  Callidus' proposed injunctive relief requires only that Esco abide by its *pre-existing* obligations to provide timely financial information and to cause all receipts (including from the sale of collateral) to be placed in the Blocked Account. That adhering to its agreements with Callidus might make business more difficult for Esco is no excuse.  *See, e.g., Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 225-26 (Tex. App. Houston [1st Dist.] 1989, no writ) (affirming on appeal a temporary injunction despite defendant's argument that "the court's action destroyed their business and reputation and prevented them from paying their creditors"); *Plainfield Specialty Holdings II Inc.*, 634 F. Supp. 2d at 849-50 (granting injunctive relief despite arguments that doing so might harm the borrower).  An order requiring Esco to comply with the Loan Agreement should come as no surprise to Esco.  *Accord Gen. Elec. Capital Corp. v. Deer Valley Trucking, Inc.*, No. 4:14-cv-150, 2014 WL 6686731, at *5 (D.N.D. Nov. 26, 2014) (recognizing that although injunctive relief "may cause [borrower] some degree of business interruption, . . . this situation was bargained for in the Loan Documents and should come as no surprise").

50.     Moreover, any harm that Esco may suffer is mitigated by a number of factors. First, there is no potential for *irreparable* harm to Esco because (as was the case in *Plainfield Specialty*) any damages resulting from an injunction "would be compensable in money damages, there is no showing that [Callidus] would be judgment-proof, and the prospective harm to [Callidus] consists entirely of being compelled to fulfill its obligations under valid security agreements."  *Plainfield Specialty Holdings II Inc.*, 634 F. Supp. 2d at 848 (finding, therefore, that the third factor "weighs in favor of an injunction").

20

51.     Second, under the proposed temporary restraining order and temporary injunction, this Court would appoint Duff & Phelps as a custodian to (1) ensure that all receipts are deposited in the Blocked Accounts and (2) ensure that Esco provides timely financial reports and other documents to Callidus as required under the Loan and Security Documents.   Such appointment of a custodian—which is permissible in accordance with this Court's "broad equitable powers to fashion an appropriate remedy"—will "ameliorate any potential harm to [Esco] by issuance of an injunction."  *Id.* at 836, 849 (authorizing appointment of custodian to oversee expenditures of defendant borrower in like circumstances); *see also Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1997) ("The district court has traditionally had the equitable power to fashion any remedy necessary and appropriate to do justice in a particular case.").  Indeed, Esco contractually agreed to provide Duff & Phelps with broad and immediate access to Esco's business operational business records. *See* Loan Agreement, Ex. A-1, § 15(a)(iv); Engagement Letter between Esco Marine, Inc. and Duff & Phelps Canada Restructuring Inc., attached as Exhibit A-31.  The Court's appointment of Duff & Phelps as custodian is a natural extension of its present responsibilities that is necessary given Esco and Its Management's dishonesty and willful breaches of the Loan Agreement.  Finally, Callidus is willing to move forward with trial as expeditiously as necessary, thus limiting any alleged impact of injunctive relief.

52.     Given that the harm to Esco, if any, can be characterized as merely requiring Esco to comply with its pre-existing obligations under the Loan Agreement *and* given the several mitigating factors discussed above, the harm to Callidus absent an injunction significantly outweighs the harm to Esco (if any) caused by injunctive relief.  In the absence of an injunction, Esco would be allowed to strip the loans of security.  But Esco has no right to deny Callidus the

security for which it bargained. *See, e.g., Marine Midland Trust Co. v. Alleghany Corp.*, 28 F. Supp. 680, 683-84 (S.D.N.Y. 1939) ("If a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced.").

        D.     **Granting Injunctive Relief Serves The Public Interest.**

        53.     The systemic consequences of failing to protect Callidus' collateral and uphold its rights under the Loan and Security Documents make clear that injunctive relief best serves the public interest. Absent injunctive relief here (and specific performance of secured loan agreements more generally), "the secured creditor would be relegated to an action for damages and would share his debtor's property with other unsecured creditors. As to assets which were intended for his security he would be on the footing of an unsecured creditor." *Marine Midland Trust Co. of New York*, 28 F. Supp. at 684 (granting injunctive relief where it was "obvious, upon a consideration of the defendant's present financial condition, that if the [collateral] is dissipated, a final decree ordering specific performance would be an idle ceremony").

        54.     Upholding Callidus' rights to its collateral, therefore, would vindicate secured lending that is at the core of today's credit-driven economy. *See, e.g., Plainfield Specialty*, 634 F. Supp. 2d at 848. "Because the UCC system is designed to ensure that secured creditors do not have to fight with their debtors in litigation in order to obtain satisfaction of monies lent on security, allowing a debtor like [Esco] to avoid its financial commitments and contractual obligations would not be in the public interest." *Id.*; *see also Gen. Elec. Capital Corp.*, 2014 WL 6686731, at *4 ("[T]he public has an interest in protecting the orderly enforcement of loan obligations and the right to contract.").

### E.    A Bond Is Not Required In The Fifth Circuit And Should Be Nominal At Most.

55.    Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security *in an amount that the court considers proper* to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added). Construing this language, "[t]he Fifth Circuit has stated that the district court 'may elect to require no security at all.'"  *Watkins v. City of Arlington*, Civil Action No. 4:14-cv-381-O, 2014 WL 3408040, at *14 (N.D. Tex. July 14, 2014) (quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 629 (5th Cir. 1996)).  "A bond of zero is appropriate in this instance because [Callidus] is merely requesting the court to issue an injunction to maintain the status quo between the parties pending resolution of their dispute . . . ."  *FUNimation Entm't v. SC Films Int'l, Inc.*, Case No. 4:13-cv-329, 2013 WL 5770383, at *2 (E.D. Tex. Oct. 24, 2013); *see also Plainfield Specialty*, 634 F. Supp. 2d at 849 (requiring a zero bond under similar circumstances).

### IV.    CONCLUSION AND PRAYER

For the reasons set forth above, Callidus requests that the Court grant this motion and issue a temporary restraining order and (after notice and opportunity for a hearing) a preliminary injunction requiring Esco, including its respective officers, directors, agents, partners, employees, attorneys, representatives, successors, assigns, and all other persons in active concert or participation with Esco to:

a.    immediately deposit into the Blocked Account all funds received from all sources—including, without limitation, customer payments, proceeds from the sale of collateral all account receivable payments, cash sales receipts, and credit card payments—in accordance with Section 16(a) of the Loan Agreement;

b.    immediately direct in an email or fax to all third parties, including Esco's customers, collateral purchasers and account debtors, that all current and future payments be deposited directly and solely into the Blocked Account in

accordance with Section 16(a) of the Loan Agreement, with proof of such direction provided to the Court and Callidus;

c.      immediately provide to Callidus all past-due financial reports in accordance with Section 20 of the Loan Agreement; and

d.      promptly provide to Callidus all future financial reports when due in accordance with Section 20 of the Loan Agreement.

In addition, Callidus requests that the Court appoint Duff & Phelps Canada Restructuring

Inc. as "custodian" for Esco with the power and authority to:

a.      ensure that all funds received by Esco from all sources including, without limitation, all account receivable payments, cash sales receipts, credit card payments, and any and all refunds received from any source whatsoever and any proceeds of any advances or other loans made to Esco are deposited solely into the Blocked Account;

b.      ensure that Esco directs all third parties, including Esco's account debtors that remit payments by electronic funds transfers, to remit, deposit, or otherwise transfer all current and future payments directly and solely into the Blocked Account (including the right for the custodian to directly notify such third parties of the Court order if Esco fails to do so);

c.      ensure that all third parties are in fact remitting, depositing, or otherwise transferring all payments directly and solely into the Blocked Account;

d.      ensure that Esco provides all past-due financial reports that have been required by Section 20 of the Loan Agreement to Callidus;

e.      ensure that Enso promptly provides all financial reports required under Section 20 of the Loan Agreement to Callidus; and

f.      provide recommendations to Callidus regarding future advances to Esco, with the understanding that Duff & Phelps shall have no liability for, and Callidus shall have sole decision-making authority with respect to, such future advances.

Callidus also requests the Court to:

a.      schedule a hearing on Callidus' motion for preliminary injunction within fourteen (14) days of the Court's order granting a temporary restraining order;

b.      enter an order providing for immediate discovery, with (i) documents to be produced within three business days of requests served under Fed. R. Civ. P. 34 and within five business days of the service of subpoenas upon third parties (including, without limitation, Esco's banks, customers, collateral purchasers and the prospective buyer (Peter Molinari and Marcella Molinari Group)), and

(ii) depositions to take place with notice of three business days (with depositions permissible on weekends);

c.     after such preliminary injunction hearing, enter an order granting preliminary injunctive relief substantially as requested above; and

d.     set this case for trial on an expedited basis.

Respectfully submitted,

BRACEWELL & GIULIANI LLP


By:     /s/ *Bradley J. Benoit*
          Bradley J. Benoit
          State Bar No. 24012275
          Southern District of Texas Bar No. 24495
          Attorney-In-Charge

711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile: (713) 221-1212
brad.benoit@bgllp.com

OF COUNSEL:

BRACEWELL & GIULIANI LLP

Ralph D. McBride
State Bar No. 13332400
Bryan S. Dumesnil
State Bar No. 00793650
Jonathon K. Hance
State Bar No. 24065364
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:  (713) 221-1212
ralph.mcbride@bgllp.com
bryan.dumesnil@bgllp.com
jonathon.hance@bgllp.com

DICKINSON WRIGHT PLLC

Thomas G. McNeill

25

500 Woodward Avenue, Suite 4000
Detroit, Michigan, 48226
(313) 223-3632
tmcneill@dickinsonwright.com

COUNSEL FOR PLAINTIFF
CALLIDUS CAPITAL CORPORATION

## CERTIFICATE OF CONFERENCE

I hereby certify that on January 2, 2015, Thomas G. McNeill, co-counsel for Plaintiff Callidus Capital Corporation, notified Mark Blakemore, a lawyer who has in the past served as counsel for Defendants, by electronic mail that Plaintiff would be seeking a temporary restraining order ("TRO") from this Court on Monday, January 5, 2015.  Plaintiff's counsel also conferred with Defendants' litigation counsel, Michael Rodriguez, on January 4, 2015, but the parties were unable to resolve this dispute without the Court's intervention.  On that same day, January 4, 2014, I provided Mr. Rodriguez by electronic mail a copy of the proposed TRO that Plaintiff would seek from the Court.

/s/ *Bradley J. Benoit*
Bradley J. Benoit
Counsel for Plaintiff

27

#4778190.6