IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CALLIDUS CAPITAL CORPORATION | § § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. 1:14-cv-00270 |
| ESCO MARINE, INC., ESCO METALS, LLC, ESCO SHREDDING, LLC, TEXAS BEST RECYCLING, LLC, TEXAS BEST EQUIPMENT, LLC, RICHARD JAROSS, EMJ HOLDINGS, LLC, ELKA JAROSS, ANDREW LEVY, REDSTONE CAPITAL CORP., ALBERTO GARCIA, and JOHN KRISTOPHER WOOD | § § § § § § § § § § § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

Come Now Defendants[1] in the above-entitled and numbered cause and file this Response to Plaintiff's Motion for Preliminary Injunction ("Motion") and would respectfully show as follows:

I. SUMMARY OF ARGUMENT

1. The purpose of a preliminary injunction is to maintain the status quo, i.e., the last peaceable status pending between the parties, to preserve the court's ability to render a meaningful decision on the merits. *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975); *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir. 1974). Plaintiff's Motion is not merely an attempt to preserve the status quo to enable the Court to adjudicate the merits of this dispute. Instead, through the guise of a motion for injunctive relief, Callidus Capital Corporation ("Callidus") essentially seeks to seize all of

---
[1] "Defendants" shall refer to all defendants named herein, collectively or individually, as the context may require.

Defendants' assets, forcing Defendants to cease operations, terminate over 300 employees, shut down a U.S. Navy contract to dismantle and demilitarize the aircraft carrier USS Saratoga, and find themselves unable to even defend this lawsuit.

2.      There is considerable question about the validity or enforceability of the Loan Agreement and the subsequent Amendment thereto as indicated by the numerous affirmative defenses including fraud and duress, which will be raised in the Answer filed later this week. However, if Plaintiff is granted the preliminary injunction it seeks, Defendants will never have the opportunity to present any such arguments, because ESCO[2] will no longer be in business.

3.      Plaintiff readily admits that the purpose behind the loans at issue herein was to provide "financing to maintain operations as ESCO sought a buyer for its business." *See Motion.* However, the egregiously one-sided loan documents and Callidus' refusal to advance the funds as promised in the loan documents and in breach thereof, put ESCO in a position in which it was struggling more than ever to maintain operations and was begging Callidus for every penny it needed to pay essential expenses.  Now, Plaintiff has come to this Court making bold, unfounded assertions that Defendants are engaged in the misappropriation or theft of collateral, when the reality of the situation is simply that at times, ESCO was forced to use some of its receipts to pay essential operating expenses to keep its doors open and its employees paid when Callidus had unreasonably withheld such payments.

4.      Since the filing of this Motion, Defendants have deposited all money into the Blocked Account as requested, have provided Plaintiff all requested financial reporting, and have allowed Duff & Phelps, Plaintiff's financial advisors, to perform the tasks at ESCO that Callidus has asked for.  However, as a result of depositing all money into the Blocked Account, ESCO's continued existence is entirely dependent on Callidus advancing the funds required to pay essential business expenses.  Callidus maintains that it has no obligations to make such advances, and ESCO is currently completely at Callidus' mercy.

---

[2] "ESCO" as used herein shall refer to ESCO Marine, Inc., ESCO Metals, LLC, ESCO Shredding, LLC, Texas Best Recycling, LLC, and/or Texas Best Equipment, LLC, collectively or individually, as the context requires.

## II.   FACTUAL BACKGROUND[3]

5. In early 2014, ESCO was financed by SIMS Metal Management, Inc. ("SIMS"), which came under direction of its board to stop lending to its suppliers of metal, such as ESCO. Thus, ESCO needed to obtain a bridge loan, or similar arrangement, that would enable it to continue operations while it sought permanent financing or a buyer for the company. ESCO needed to satisfy its obligations with SIMS by the end of June 2014 to avoid losing the business to SIMS.

6. Defendants spoke with various potential lenders before Callidus convinced Defendants to pursue the loans that it could offer. As would be expected, there were numerous meetings between Defendants and Callidus, both in Brownsville and in Canada, during which Callidus obtained significant financial information from Defendants, terms of the loans were discussed, ESCO communicated what it needed under the loans, and numerous representations were made by Callidus. Specifically, Callidus represented to ESCO that it would close the loan faster than traditional, institutional lenders, advance sufficient funds to satisfy SIMS, pay off existing debt and overdue payables, and leave ESCO with sufficient working capital to continue its operations. Based on these representations, ESCO continued negotiations with Callidus, to the exclusion of other lender options.

7. Despite its representations that it would close the loan in under six weeks, ten weeks later, the loan had still not closed. In the final days and hours leading up to closing on June 30, 2014, during a time that Callidus knew ESCO had no other options in light of the deadlines imposed by SIMS, the terms of the loan became more onerous. For example, the interest rate was raised from 17% to over 20%, despite collateral remaining the same, and Callidus suddenly insisted on personal guarantees. However, ESCO was left with no option but to obtain whatever advances Callidus would make (though deficient of the amount promised in the documents) even if it meant agreeing to unconscionable terms and conditions.

---

[3] The factual recitations contained herein are supported by the Affidavit of Kris Wood (Exhibit A), the Affidavit of Alberto Garcia (Exhibit B), and the Affidavit of Andrew Levy (Exhibit C).

### A. *Loan and Security Documents*

8. Without conceding that the Loan Agreement and Amendment thereto are valid or enforceable, it is important for the Court to understand the nature of these documents.

9. As stated in Plaintiff's Motion, on June 30, 2014, Callidus agreed to loan ESCO up to $33,990,000 under a series of loan documents. These loan documents are attached to Plaintiff's Motion as stated in said Motion.

10. Callidus' loans to ESCO are secured by personal guarantees by Richard Jaross, Elka Jaross, EMJ Holding, LLC, Andrew Levy, and Redstone Capital. They are further secured by a deed of trust for certain real property in Donna, leasehold deeds of trust for property in Brownsville, and liens on title to the tugboat and barge assets of ESCO. Callidus also has a first-priority security interest in all of ESCO's personal property assets, including permits and licenses.

   *i.* <u>Unconscionable Provisions</u>

11. Plaintiff's Motion does a fair job of outlining some of the most unconscionable provisions of the Loan Documents. For example, Callidus had the right to demand payment in full of all advances at any time. Moreover, ESCO was required to deposit all funds received from any source into a Blocked Account, and all money in the Blocked Account immediately became property of Callidus. This meant that Callidus owned all funds being paid to ESCO, even if no default had occurred, and Callidus had no requirement to apply these funds to the outstanding loan balance or to allow ESCO to use the funds to operate its business and keep its 300 employees employed. In addition, it required that ESCO establish a hedging program that met Callidus' approval—knowing that ESCO had previously tried to establish such a program but failed due to its financial condition and without providing the financial backing required to establish such a program.

   *ii.* <u>Callidus Immediately Breached the Loan Agreement</u>

12. Under the plain terms of the Loan Agreement, on the Effective Date, Callidus was required to lend a total of $22,600,000 under Facility B, Facility C, Facility D, and Facility F. Loan Agreement 5(a). Facility Specifically, this paragraph states:

> Paragraph 5(a): On the Effective Date, Lender shall advance, and Borrower shall borrow the collective amount of twenty-two million, six hundred thousand dollars ($22,600,000) under the Facility B loan, Facility C loan, Facility D loan and Facility F loan (the "Initial Term Advance").

13. On June 30, 2014, the Effective Date, after the Loan Agreement was signed, Callidus refused to advance the $3,500,000 under Facility F (which was secured by future cash flow from the USS SARATOGA contract). Prior to closing, Callidus knew that ESCO needed the full amount promised, specifically the $3,500,000 under Facility F, in order to pay off existing debt, overdue payables, and other expenses.

14. Callidus' refusal to advance this $3,500,000, which was to be advanced on the Effective Date and was part of the consideration for the agreement with Callidus, meant that ESCO could not pay down the overdue payables, making it difficult for ESCO to pay essential operating expenses, and giving ESCO no opportunity to right the ship.

15. The Loan Agreement also called for an 80-85% advance rate (depending on category) against inventory in Facility A (the revolving credit line). From the Effective Date forward, Callidus refused to advance the entire 80-85%, contrary to the express terms of the Loan Agreement. This shortfall, in violation of the Loan Agreement, exacerbated ESCO's lack of liquidity.

   iii. *Callidus Used Economic Duress to Obtain an Amendment to the Agreement*

16. By October 2014, Callidus' breaches of the Loan Agreement, specifically its underpayment thereunder, had put ESCO in a position that it was struggling to maintain operations. Nevertheless, in September 2014, Esco was awarded by U.S. Maritime Administration ("MarAd") the USS Shenandoah and the USS Yellowstone. These vessels required about $5,000,000 of capital to purchase and tow. Callidus initially refused to advance the funds needed to acquire these vessels, but ultimately agreed to advance the funds it should have originally paid under the Loan Agreement if ESCO would enter an Amendment to the Loan Agreement.

17. ESCO was desperate to keep its relationship with MarAd, as being blacklisted by this provider would mean that it would lose future vessels it needed to maintain production. However, in large part because Callidus failed to make the advances as required by the original Loan Document, ESCO could not obtain these vessels without Callidus' funding.

18. Thus, in exchange for an agreement to finally advance the previously promised funds under Facility F, Callidus forced ESCO to sign the Amendment. This Amendment, signed by ESCO under economic duress and with no consideration, purported to make all advances discretionary, including those that Callidus was required to make on the Effective Date, and it attempted to release Callidus from any liability for its prior breaches of the Loan Agreement. Callidus also imposed an additional $900,000 fee as part of the Amendment.

### B. *ESCO is Not Stealing Collateral; It is Just Trying to Stay in Business*

19. In its Motions and exhibits thereto, Callidus acknowledges that it did not advance the full amount owed on the Effective Date. It also acknowledges, that within months of the Effective Date, ESCO was telling Callidus that it needed the full amount promised in order to pay critical vendors and continue operations. Once ESCO was in a sufficiently desperate position, "Callidus sought to end these assertions" by forcing ESCO to sign an agreement retroactively making all advances discretionary and releasing Callidus from liability before it would pay the money it previously owed. *See Motion*. Since executing this Amendment, Callidus has hung its hat on this "discretionary" language and unreasonably refused to advance ESCO enough funds to maintain its operations, despite ESCO's candor in advising Callidus that without additional funding it would be forced to shut down operations.

20. In November 2014, after being denied the required funding, ESCO was forced to pay employee salaries, facility and equipment insurance, cutting fuels and consumables, and other essential business expenses from the sale of scrap metal without first transferring these funds to the Blocked Account and subsequently begging Callidus to make the advance. In December 2014, ESCO was again required to pay for essential business expenses such as employee salaries, port and equipment leases, employee

medical insurance, towing costs not funded by Callidus, cutting fuels and consumables, with receivables prior to depositing the funds into the Blocked Account because Callidus was refusing to make the necessary advances.

21. These expenses were absolutely necessary to keep ESCO in operation and to allow ESCO to pay its 300 employees.

22. Contrary to Plaintiff's claim that Defendants have "stolen" collateral, all of these funds were used solely to maintain ESCO's ongoing operations, and the expenditures have been and/or can be verified by Duff & Phelps, a financial consulting firm selected by Callidus.

23. Callidus' real complaint here appears to be that ESCO has managed to stay in business instead of letting the ship sink so that Callidus could waltz in and claim its collateral.

24. Callidus' breach of the loan agreement has crippled ESCO by not funding the initial amount promised, refusing to advance funds necessary to keep the doors open, and making the company less marketable to prospective buyers or fundable by other lenders.

## III.   ARGUMENT AND AUTHORITIES

25. A preliminary injunction is an extraordinary equitable remedy that may be granted only if plaintiff establishes the following four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied, (3) that the threatened injury outweighs any damage that the injunction might cause defendants, and (4) that the injunction will not disserve the public interest. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999). The Fifth Circuit has repeatedly cautioned that a preliminary injunction is an extraordinary remedy that should not be granted "unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements.'" *Bluefield Water Ass'n Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (internal citation omitted). The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)

26. Callidus cannot meet its burden of demonstrating that each of the four factors favors an injunction. Indeed, the injunction Plaintiff requests is contrary to the primary purpose of an injunction, which is to preserve the court's ability to decide the matter on the merits, since the requested injunction would have the effect of forcing ESCO to cease operations and close its doors.

### A. *Callidus has not shown a strong likelihood of success on the merits*

27. "An evaluation of plaintiffs' likelihood of success on the merits entails two questions: the proper standard to be applied in evaluating [plaintiff's] claims; and the application of this standard to the facts presented in the record." *Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 334 (5th Cir. 1981).

28. Plaintiff has brought claims against Defendant(s) for breach of the loan documents, conversion, and liability under the Theft Liability Act. The record fails to demonstrate a strong likelihood of success on the merits of any of these causes of action.

#### i. ESCO is Not Liable for Breach of the Loan Agreement

29. Defendants do not dispute Plaintiff's recitation of the elements of a breach of contract claim—(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *See Motion.*

30. Plaintiff cannot demonstrate a strong likelihood of success in proving the first element of its breach of contract claim – the existence of a valid contract. Defendants have numerous defenses to the validity and enforceability of the Loan Agreement and Amendment thereto. Specifically, Defendants will assert the affirmative defenses of fraud, fraudulent inducement, lack of consideration, duress, and estoppel.[4] The brief factual recitation set forth above and in the attached affidavits supports these affirmative defenses. *See Affidavit of Kris Wood, Exhibit A; Affidavit of Alberto Garcia, Exhibit B; and Affidavit of Andrew Levy, Exhibit C.* For example, there is a substantial basis for Defendants to set aside these loan documents on the basis that Defendants were

---

[4] Defendants' answers are not yet due, but they will include such affirmative defenses that defeat the validity or enforceability of the Loan Documents.

fraudulently induced to enter the Loan Agreement, Guaranties, Amendment and other Loan and Security documents. Moreover, even the limited evidence currently in the record supports a claim that Defendants signed the Loan and Security documents under economic duress. The record also demonstrates a valid defense of failure or lack of consideration for the Amendment of the Loan Agreement. Such defenses, supported by the attached affidavits and as will be further developed throughout this litigation, undermine Plaintiff's contention that it has a strong likelihood of success on the merits of this breach of contract claim.

31. Moreover, Plaintiff fails to satisfy the second element of this cause of action because it failed to perform as promised. As discussed above and admitted by Plaintiff in its Motion, Plaintiff did not advance the entire $22,600,000 on the Effective Date as it was required to do under the terms of the Loan Agreement. Plaintiff's failure to perform its very first obligation under the Loan Agreement undermines its breach of contract claim. Plaintiff's effort to obtain a release for its breach of the Loan Agreement—as contained in the Amendment to the Loan Agreement—underscores Plaintiff's knowledge that it failed to perform under the Loan Agreement and needed to coerce Defendants to absolve Plaintiff's prior breach.

32. The fact that there is serious doubt as to the validity of the loan documents and that Plaintiff failed to perform its obligations thereunder prevent Plaintiff from establishing that it has any likelihood of succeeding on the merits of this claim.

*ii. ESCO has Not Converted Callidus' Property*

33. To establish a cause of action for conversion, Plaintiff must prove that "(1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; and (3) the plaintiff suffered injury." *Lopez v. Lopez*, 271 S.W.3d 780, 784 (Tex. App.--Waco 2008, no pet.) (citing *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147-48 (Tex. 1997); *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.--Austin 1997, pet. denied)). If the defendant originally acquired possession of the plaintiff's property legally, the plaintiff must establish that the defendant refused to

return the property after the plaintiff demanded its return. *Id.* (citing *Presley v. Cooper*, 284 S.W.2d 138, 141 (Tex. 1955); *Apple Imports*, 945 S.W.2d at 899).

34. "When an indebtedness can be discharged by payment of money generally, an action in conversion is inappropriate." *Eckman v. Centennial Sav. Bank,* 757 S.W.2d 392, 398 (Tex. App.--Dallas 1988, writ denied). An action for the conversion of money may be brought where money is (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper. *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.--Dallas 1992, writ denied) (citing *Houston Nat'l Bank v. Biber,* 613 S.W.2d 771, 774-75 (Tex. Civ. App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.)).

35. Plaintiff's claim of conversion is based solely on Defendants' actions in using certain money received by ESCO to pay critical expenditures necessary to continue ESCO's operations.

36. Callidus' claim that it owned or had legal entitlement to the purportedly converted funds rests solely on the validity of the Loan and Security documents. As discussed above, Defendants have viable affirmative defenses to the validity and/or enforceability of these documents in part because they were procured by fraud and duress.

37. Assuming without conceding that the Loan and Security documents gave Plaintiff ownership or legal entitlement to these funds, Defendants use of this money did not constitute conversion. As discussed above, due to Callidus' refusal to fund in accordance with the Loan Agreement and the purpose of the loans, ESCO was required to use some of its receivables to pay essential business expenses in order to continue operations. When the loan, by Plaintiff's own admission, was made for the purpose of maintaining ESCO's operations, it is difficult to conceive how payments to critical vendors and other necessary expenditures could constitute conversion.

38. Moreover, an action for conversion is inappropriate in this case where the indebtedness can be discharged by payment of money, as indicated by the case law cited above.

39. There is no question that ESCO acquired the money legally when its receivables came into the corporation. It used those funds to only pay essential expenditures, which can be/have been verified by Duff & Phelps. Contrary to the allegations in Plaintiff's

Motion, Defendants have recommenced depositing all money into the Blocked Account and has assured Plaintiff that it is not advising customers to deposit funds into the Disbursement Accounts.

40. In addition, with respect to the individual Defendants, there is no indication that any of them acted outside their role as officers, employees, or agents of ESCO, and thus there is no basis for any claims against them individually for conversion.

41. Plaintiff has not demonstrated a strong likelihood of success on this cause of action.

### iii. *ESCO has Not Stolen Callidus' Property*

42. The elements of a cause of action under the Texas Theft Liability Act are: (1) the plaintiff had a possessory right to property or was the provider of services; (2) the defendant unlawfully appropriated property or unlawfully obtained services in violation of certain sections of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. Tex. Civ. P. Rem. Code §§ 134.002(2), 134.003; Tex. Penal Code §§ 31.03(a). The plaintiff must also prove that the defendant possessed an intent to deprive the plaintiff of its property permanently or for an extended period of time. Tex. Penal Code § 31.03. Deprive means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." Tex. Penal Code § 31.01; *Olufemi-Jones v. Bank of Am., N.A.,* 3:12-CV-3428-L, 2013 U.S. Dist. LEXIS 51464, *8-9 (N.D. Tex. Apr. 10, 2013)

43. Plaintiff's Motion fails to even address the higher standards involved in succeeding on a claim under the Theft Liability Act. Plaintiff cannot show that Defendants had the requisite intent to deprive the Plaintiff of its money permanently or for any extended period of time. Indeed, the money that is the subject of Plaintiff's theft claim was used to maintain ESCO's operations to enable it to continue its flow of receivables, which Callidus enjoys the benefit of to this date.

44. In addition, the source of Callidus' purported possessory right is the Loan and Security documents, to which Defendants has meritorious affirmative defenses as discussed above, making them voidable, invalid, and/or unenforceable.

45. Moreover, with respect to the individual Defendants, there is no indication that any of them acted outside their role as officers, employees, or agents of ESCO, and thus no basis for any claims against them under the Texas Theft Liability Act.

*iv.* *Callidus Cannot Demonstrate a Likelihood of Success; Injunctive Relief is Inappropriate*

46. For the reasons discussed above, Plaintiff cannot meet the first requirement to show itself entitled to a preliminary injunction—the record does not demonstrate that Plaintiff has a strong likelihood of success on the merits of its cause of action for breach of contract, conversion, or theft liability act.

***B.    Plaintiff has not shown that it will be irreparably harmed absent an injunction***

47. Plaintiff must demonstrate that absent an injunction, it will suffer irreparable harm. Indeed, showing irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995).

48. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The Supreme Court has observed that:

> [t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974). Accordingly, where a plaintiff may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable. *Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC*, 4:11-CV-3218, 2011 U.S. Dist. LEXIS 120137, 16 (S.D. Tex. Oct. 18, 2011) (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

49. Indeed, where a plaintiff can be compensated by monetary relief, an injunction is only appropriate if the plaintiff demonstrates extraordinary circumstances, such as evidence that the defendant is likely to be insolvent before final judgment or that the defendant intends to dissipate assets to make a judgment awarding damages uncollectable. The Supreme Court has emphasized a plaintiff must show irreparable harm is likely, not merely that there is a possibility of irreparable harm. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

   i.   *Plaintiff has Not Shown that It Cannot be Compensated Monetarily*

50. Plaintiff has filed suit seeking money damages and there is no indication that absent a preliminary injunction Plaintiff will be harmed in any way that cannot be compensated monetarily. Moreover, Plaintiff has not presented evidence that Defendants are likely to become insolvent or that it plans to dissipate its assets, making it impossible to collect a judgment for money damages.

51. Plaintiff argues, and cites case law, that it will be irreparably harmed because ESCO is unable to satisfy a money judgment of this magnitude. However the evidence offered does not demonstrate that ESCO will be insolvent. Admittedly, ESCO is struggling, which is why it sought the loan from Callidus in the first place, but this does not mean that it will become insolvent. It is also interesting to note that a contributing factor in ESCO's struggles stem from Callidus' initial breach of the Loan Agreement wherein it failed to fully fund the amounts promised to be advanced on the Effective Date. In any event, the mere *possibility* of insolvency is insufficient and Plaintiff's evidence does not show that ESCO will be insolvent.

52. Additionally, to the extent there is a valid loan agreement, it is secured by personal guarantees, liens on real property and tugboats and barges belonging to Defendants, in addition to ESCO's receivables. Plaintiff fails to demonstrate that this collateral is insufficient to satisfy any judgment that it might secure against Defendants.

   ii.  *Plaintiff's Security Interests are Not at Risk*

53. Contrary to Plaintiff's groundless assertion, there is no indication that ESCO has any intention of compromising Plaintiff's security interests or that Callidus is at any

actual risk of losing any of these security interests. Indeed, among other items, Callidus has security interests in ESCO's contracts to dismantle three aircraft carriers. Callidus, without proof, seems to believe that ESCO is attempting to assign the contracts or attempting to hide aircraft carriers. There is no basis for this, accordingly no basis for a preliminary injunction to preserve the security interests.

54. Both in the hearing before this Court on January 6, 2015 and in its Motion, Plaintiff has analogized this case to a matter out of the Eastern District of Michigan, *Plainfield Specialty Holdings II Inc. v. Children's Legal Servs. PLLC*. 634 F. Supp. 2d 833 (E.D. Mich. 2009). In that case, unlike the one at hand, the record before the court demonstrated that "there are reasons here to be concerned about the availability of the collateral absent an injunction." *Id.* at 846. Here, the only evidence of any funds not being deposited into the Blocked Account were used solely for the payment of essential expenditures to enable ESCO to continue its operations, in turn earning additional receivables for Plaintiff's benefit. On these facts, Plaintiff cannot reasonably suggest that it is somehow insecure as a result of this necessary deviation, into which Plaintiff forced ESCO.

55. Again, however, the security interest that is at issue are the funds, primarily receivables, flowing into ESCO. This takes us back full circle to the fact that Callidus can be compensated by money damages and its harm, therefore, is not irreparable.

### C. *The Balance of Relative Harm Favors Defendants*

56. Plaintiff cannot demonstrate that the relative harm absent an injunction is greater than the harm to ESCO caused by Plaintiff's requested injunction.

57. To the extent Plaintiff has a secured interest in any of ESCO's assets, that interest is secured by assets with a value substantially greater than Plaintiff's alleged debt, and Plaintiff's alleged interest is preserved by ESCO continuing as a going concern.

58. In contrast, if Plaintiff obtains its requested relief, the harm to ESCO will be swift and severe: ESCO will be unable to pay its necessary business expenses; it will be forced to close its doors and terminate its 300 employees, and ESCO's counsel will likely be required to withdraw from this case, rending ESCO defenseless. Plaintiff will have accomplished its objective and gained control of 100% of ESCO's assets without a full

adjudication of ESCO's claims and defenses. Accordingly, the balance of relative harm squarely favors ESCO and there should be no injunction.

59. If Defendant cannot pay its essential business expenses, it will be forced to stop work on its U.S. Navy contract to dismantle the USS Saratoga—endangering this contract and all future business with the U.S. Navy. Moreover, the contract is classified, and Callidus does not have the requisite security clearance to be involved therewith. Such an unavoidable interruption in performing under this contract, which would jeopardize future multi-million contracts with the U.S. Navy, further demonstrates that the balance of harm favors ESCO.

60. As mentioned above, Plaintiff's counsel repeatedly refers to *Plainfield Specialty Holdings II Inc. v. Children's Legal Servs. PLLC* as a case closely analogous to the one at hand. 634 F. Supp. 2d 833 (E.D. Mich. 2009). Defendants do not dispute the considerable similarities between the cases nor the fact that the district court in *Plainfield* issued a preliminary injunction. However, the preliminary injunction entered in that case, differed from the one Plaintiff requests herein in one key respect, which Plaintiff has failed to acknowledge: in *Plainfield,* the injunction permitted the defendant to "pay for essential business costs" subject only to independent verification by the appointed custodian. *Id.*[5] Unlike the preliminary injunction Plaintiff requests here, the injunction entered by the court in *Plainfield* did not have the effect of immediately putting the defendant out of business. Rather, in *Plainfield*, the injunction had the intended effect of preserving the parties' respective positions so that the court had the ability to render a meaningful decision on the merits. *Id.* Although the plaintiff in *Plainfield* did not request the provision allowing the defendant to pay essential business expenses, in an effort to enter an equitable order, that court added that provision.

61. If this Court for some reason were to determine that a preliminary injunction is appropriate, Defendants request that, like the order in *Plainfield,* any such order serve the intended and limited purpose of preventing irreparable injury to either party so as to preserve the court's ability to render a meaningful decision on the merits. *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir. 1974). This would necessarily require a provision that would allow ESCO to continue to pay for essential business costs.

---

[5] For the Court's convenience, a copy of the court's order in *Plainfield* is attached hereto as Exhibit D.

62. To the extent that Plaintiff may contend that the "status quo" currently does not provide ESCO any right to pay its essential expenses (which appears to be Plaintiff's argument), Defendants request that the Court use the requested preliminary injunction to alter this inequity to enable ESCO to remain in business. *Id.* (noting that if the "existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury."). Indeed, the case law on which Plaintiff relies, specifically *Plainfield*, indicates that the Court is free to craft such a caveat into any injunction it enters.

63. In balancing the harm to the respective parties, Defendants undoubtedly will suffer greater harm by forcing ESCO—a local business that has operated over 30 years and employs over 300 people in this area—to close its doors and leaving Defendants without even the money required to pay for their defense. Accordingly, if the Court enters an injunction, which Defendants do not concede is appropriate, Defendants asks that it include provisions to allow ESCO to stay in business, as the district court did in *Plainfield.*

### D. The Public Interest would be Harmed by Granting Plaintiff's Requested Injunction

64. Federal courts have given increasing attention to the importance to the public interest of preliminary injunctive relief, perhaps as a demonstration of judicial concern about the impact of legal decisions on society as a whole as opposed to the more limited interests of private litigants. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625-26 (5th Cir. 1985). Courts should deny preliminary injunctive relief if it is found that public policy would be harmed by such an award. *13-65 Moore's Federal Practice - Civil § 65.22.*

65. In the present case, the public interest would be best served by denying Plaintiff's Motion for a preliminary injunction.

66. On a local level, this injunction would immediately put an established, local company out of business. The business employs over 300 people, meaning that the inevitable termination of these individuals would affect 300 families in the area.

67. In addition, an important job for the U.S. Navy would be jeopardized.

68. On a larger level, it is not in the public interest to reward such predatory lending practices by giving such lenders the ability to effectively close down a borrower's business without any determination of the parties' respective rights and obligations on the merits.

## IV. CONCLUSION

69. For the reasons set forth above, the Court should deny Plaintiff's Motion for a Preliminary Injunction. Specifically, the record before the Court does not establish that Plaintiff has a substantial likelihood of success on the merits of its breach of contract, conversion, or theft liability act claims. Moreover, Plaintiff has failed to establish that it will suffer irreparable harm absent an injunction, particularly because it seeks monetary relief and has failed to demonstrate that ESCO is insolvent or intends to dissipate its assets, making collection of a judgment impossible. Plaintiff cannot show that the threatened injury outweighs any damage that the injunction might cause defendants; indeed, the record reflects the contrary. If the Court enters the injunction Plaintiff requests, ESCO will no longer be able to operate. Lastly, the injunction will disserve the public interest, putting 300 local employees out of work and rewarding Plaintiff's predatory lending practices.

70. In the alternative, if the Court finds that an injunction is necessary, Defendants request that the injunction include a provision that allows ESCO to continue to pay essential business and operating expenses.

Respectfully submitted,

By: *E. Michael Rodriguez electronic signature*
Eduardo Roberto Rodriguez
State Bar No. 00000080
Federal ID No. 1944
errodriguez@atlashall.com
E. Michael Rodriguez
State Bar No. 00791553
Federal ID No. 18759
mrodriguez@atlashall.com
Erin A. Hudson
State Bar No. 24059978
Federal ID No. 1101277
ehudson@atlashall.com
**ATLAS, HALL & RODRIGUEZ, LLP**
50 W. Morrison Road, Suite A
Brownsville, Texas 78520
Telephone: (956) 574-9333
Facsimile: (956) 574-9337
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below, in compliance with the Texas Rules of Civil Procedure on this 19th day of January, 2015.

>Bradley J. Benoit
>Brad.benoit@bgllp.com
>Ralph D. McBride
>Ralph.mcbride@bgllp.com
>Bryan S. Dumensnil
>Bryan.dumesnil@bgllp.com
>Jonathon K. Hance
>Jonathon.hance@bgllp.com
>**BRACEWELL & GIULIANI, LLP**
>711 Louisiana Street, Suite 2300
>Houston, Texas 77002
>Telephone: 713-223-2300
>Facsimile: 713-221-1212

>>*E. Michael Rodriguez electronic signature*
>>E. Michael Rodriguez