United States District Court
Southern District of Texas
**ENTERED**
March 30, 2017
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

CALLIDUS CAPITAL CORPORATION, §
§
      Plaintiff, §
§
VS. §     CIVIL NO. 1:14-CV-270
§
ESCO MARINE, INC., *et al*, §
§
      Defendants. §

## SEALED ORDER

BE IT REMEMBERED that on March 30, 2017 the Court **GRANTED** Defendants' Opposed Motion for Leave to File Defendants' Sur-Reply in Opposition to Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 97; **GRANTED IN PART AND DENIED IN PART** Defendants' Opposed Motion for Leave to Supplement Evidence in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 108; **GRANTED IN PART AND DENIED IN PART** Defendants' Objections to Plaintiff's Summary Judgment Evidence, Dkt. No. 87; **DENIED** Defendants' Motion to Remove "Attorneys' Eyes Only" Designation from Certain Documents Produced by Plaintiff, Dkt. No. 101; and **GRANTED IN PART AND DENIED IN PART** Plaintiff's Motion for Summary Judgment as to Defendants' Amended Counterclaims/Affirmative Defenses and for Partial Summary Judgment as to Count 1 of Plaintiff's Amended Complaint, Dkt. No. 69.

## I. Relevant Procedural History[1]

This litigation arises from a dispute over the liabilities attached to emergency loan funding provided by Callidus Capital Corporation ("Callidus"), a Canadian company, to Esco Marine, Inc., a marine yard and recycling business formerly operating in Brownsville, Texas. On December 30, 2014, Callidus filed suit against Esco Marine, Inc. and affiliated defendants, raising breach of contract, foreclosure

---

[1] Throughout this opinion, the Court refers to the parties' pleadings and summary judgment exhibits by the docket numbers they have been assigned under the Federal Judiciary's Case Management / Electronic Case File (CM/ECF) system.

of security interests, conversion, and theft of property claims related to this funding. Dkt. No. 1 at 9-12. Specifically, Callidus filed its initial complaint against Defendants Esco Marine, Inc., Esco Metals, LLC, Esco Shredding, LLC, Texas Best Recycling, LLC, Texas Best Equipment, LLC, Richard Jaross, EMJ Holdings, LLC, Elka Jaross, Andrew Levy, Redstone Capital Corp., Alberto Garcia, and John Kristopher Wood. Dkt. No. 1. On August 17, 2015, the Court dismissed Defendant/Counter-Plaintiff John Kristopher Wood ("Wood"), pursuant to Federal Rule of Civil Procedure 41(a) and the parties' stipulation. Dkt. No. 51. On December 11, 2015, the Court dismissed all of Callidus's claims against Defendants Esco Marine, Inc., Esco Metals, LLC, Esco Shredding, LLC, Texas Best Recycling, LLC, and Texas Best Equipment, LLC, as these Defendants' claims were resolved in bankruptcy proceedings. Dkt. No. 57 at 2-3. Defendants now remaining in this litigation therefore include Richard Jaross, EMJ Holdings, LLC, Elka Jaross, Andrew Levy, and Redstone Capital Corporation, and Alberto Garcia ("Defendants").

Callidus filed its first amended complaint against these remaining Defendants on March 4, 2016. Dkt. No. 64. In this complaint, Callidus raises breach of guaranty, conversion, theft of property, fraud, and conspiracy claims, and seeks declaratory judgment that any claims and defenses Defendants might assert are barred under various theories. On March 18, 2016 Defendants filed an answer and affirmative defenses to this complaint, Dkt. No. 66, as well as amended counterclaims against Callidus, Dkt. No. 67. Defendants' counterclaims raise fraudulent inducement and breach of contract claims against Callidus, and seek declaratory judgment that Callidus's claims are barred on the basis of fraudulent inducement, economic duress, and unconscionability. Callidus filed its answer and affirmative defenses to Defendants' counterclaims on March 31, 2016, Dkt. No. 68, which echo the declaratory judgment claims in its complaint seeking to bar Defendants' counterclaims.

On June 29, 2016, Callidus filed a motion for summary judgment as to Defendants' amended counterclaims and certain affirmative defenses, which also

seeks partial summary judgment in favor of Callidus as to the first count in its amended complaint alleging breach of guaranty. Dkt. No. 69. Defendants, excepting Alberto Garcia ("Garcia"), timely responded to this motion on November 30, 2016, Dkt. No. 88, and on this date also filed objections to Callidus's summary judgment evidence, Dkt. No. 87.[2] Callidus replied to Defendants' summary judgment response on December 14, 2016, Dkt. No. 91, and to Defendants' objections on December 20, 2016, Dkt. No. 92. On December 28, 2016 the Court entered an agreed protective order stipulated to by the parties, governing the disclosure of certain materials produced through discovery in this litigation. Dkt. No. 94. On January 13, 2017 Defendants filed an opposed motion for leave to file a sur-reply to Callidus's motion for summary judgment, Dkt. No. 97, to which Callidus did not respond. On January 23, 2017 Defendants filed an opposed motion to remove an "attorneys' eyes only" designation from certain materials produced by Callidus pursuant to the parties' agreed protective order. Dkt. No. 101. Callidus responded to this motion on February 13, 2017, Dkt. No. 110, and Defendants replied on February 20, 2017, Dkt. No. 113. Finally, on January 27, 2017, Defendants filed an opposed motion for leave to file supplemental evidence in opposition to Callidus's summary judgment motion, Dkt. No. 108, to which Callidus responded on February 17, 2017, Dkt. No. 112.

Addressed here Court are Defendants' objections to Callidus's summary judgment evidence, Dkt. No. 87; Defendants' motion for leave to file a sur-reply, Dkt. No. 97; Defendants' motion to supplement its summary judgment evidence, Dkt. No. 108; Defendants' motion to remove the "attorneys' eyes only" designation from certain discovery documents, Dkt. No. 101; and Callidus's motion for summary judgment, which seeks a declaration that Defendants' amended counterclaims and affirmative defenses are barred or fail as a matter of law, as well as summary

---

[2] Although Garcia remains a party to this action, he is not actually implicated in these motions. However for ease of reference, with respect to the summary judgment motions now under consideration, the Court will continue to refer to "Defendants" when citing the parties asserting counterclaims and defending against Callidus's claims.

judgment on the first count of Callidus's amended complaint, which alleges that Defendants have breached the Jaross and Levy Guaranties. Dkt. No. 69.

## II. Statement of Undisputed Facts[3]

Esco Marine, Inc. and its affiliate entities[4] (collectively "ESCO") formerly operated a marine yard and scrap metal recycling business in Brownsville, Texas. In early 2014, ESCO's primary lender cut off its flow of funds to the company, leaving ESCO in need of new financing. Among other potential investors, ESCO and its leadership—including Esco's President Richard Jaross ("R. Jaross") and Andrew Levy ("Levy"), Esco's CEO and President of Redstone Capital Corporation ("Redstone")[5]—met with representatives of Callidus, both in Brownsville and in Canada, to discuss its potential role as a source of replacement financing. These meetings resulted in Callidus's production of a term sheet listing potential loan terms, which ESCO signed and on which it paid a $50,000 deposit.

On June 30, 2014, Callidus agreed to loan ESCO up to $33,990,000 under a series of loan documents. A Loan Agreement (the "Original Agreement") was signed by both parties on this date. Section 2 of the Original Agreement calls for Callidus to loan ESCO funds through Facility Loans A through F, each backed by a Demand Facility Note dated June 30, 2014. The Original Agreement is backed by the personal guaranties of all Defendants except Garcia. R. Jaross, Elka Jaross ("E. Jaross"), and EMJ Holdings, LLC (collectively "the Jaross Guarantors") guaranteed payment of ESCO's indebtedness up to an aggregate amount of $2,000,000, plus "all fees, charges, and costs incurred" in the collection of this guaranteed amount "including reasonable attorneys' fees" (the "Jaross Guaranty"). *See* Dkt. No. 69-1. Levy and Redstone (collectively "the Levy Guarantors") guaranteed payment of ESCO's indebtedness up to an aggregate amount of $600,000 plus "all fees, charges,

---

[3] Unless otherwise noted, this history is taken from Callidus's first amended complaint, Dkt. No. 64; Defendants' answer, Dkt. No. 66; Defendants' amended counterclaims, Dkt. No. 67; and Callidus's answer and affirmative defenses to these counterclaims, Dkt. No. 68.

[4] These affiliated entities include Esco Metals LLC, Esco Shredding LLC, Texas Best Recycling, LLC, and Texas Best Equipment LLC.

[5] *See* Dkt. Nos. 1 and 30.

and costs incurred" in the collection of this guaranteed amount "including reasonable attorneys' fees" (the "Levy Guaranty").

Also signed on June 30, 2014 by the parties were a number of loan and security documents including a "Security Agreement," a "Deed of Trust," "Leasehold Deeds of Trust," and "Demand Facility Notes" (collectively the "Loan and Security Documents"). The Security Agreement grants Callidus a first priority and continuing security interest in certain ESCO's property (the "Collateral"). Additionally, among other terms, these Loan and Security Documents include stipulations by the parties that Texas law governs the construction and enforcement of the contracts signed on June 30, 2014, and that venue before this Court is proper.

On June 30 and July 2, 2014, pursuant to the Original Agreement, Callidus paid out $22,689,725.16 to third parties on ESCO's behalf.[6] In September of 2014 the U.S. Maritime Administration awarded ESCO a contract to dismantle two U.S. Navy ships, the USS Shenandoah and the USS Yellowstone, which ESCO required capital to purchase. Callidus, ESCO, the Jaross Guarantors, and the Levy Guarantors signed an amendment to the Original Agreement (the "Amendment") on October 16, 2014, which purported to provide ESCO with certain financial advances, including an additional $1,111,208.85, and to release Callidus from liability for any breaches of the Original Agreement. The Amendment also required ESCO to pay a fee of $900,000 to Callidus. On November 18, 2014, Callidus mailed a letter to ESCO alleging it was in default under Section 23 of the Original Agreement, which governs and defines "Events of Default." One of the specified defaults was ESCO's failure to deposit loan funds received from Callidus into a "Blocked Account," as required by the Original Agreement. On December 3, 2014, Callidus provided ESCO with written notice of its failure to cure the defaults alleged, and declared ESCO's outstanding indebtedness accelerated and payable. Callidus demanded payment by 5:00 p.m. on December 10, 2014.

On December 30, 2014, Callidus filed the instant lawsuit. On March 7, 2015, ESCO initiated voluntary petitions in bankruptcy. The Jaross and the Levy

---

[6] *See* Dkt. No. 91-2 at 1, Aff. of David Reese, President and COO of Callidus.

Guarantors were not parties to the resulting bankruptcy proceedings. In the bankruptcy proceedings both R. Jaross and Levy admitted that ESCO failed to deposit funds in the "Blocked Account" as required pursuant to the Original Agreement. On July 21, 2015, the U.S. Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Bankruptcy Court") issued an order in Case No. 15-20107 establishing Callidus's maximum allowable claim against ESCO. The Bankruptcy Court also issued an order approving a credit bid by Callidus to purchase certain of ESCO's assets, for less than the amount of Callidus's maximum allowable claim against ESCO. In the instant litigation, Callidus seeks to recover this difference, which it alleges is a deficiency it is owed, from the Jaross and Levy Guarantors. To date, the Jaross and Levy Guarantors have failed to perform under the Guaranties.

## III.    Preliminary Pending Motions

As an initial matter, the Court addresses here four of Defendants' pending motions, all related to Callidus's motion for summary judgment. For the reasons discussed below, the Court grants Defendants' Opposed Motion for Leave to File Defendants' Sur-Reply in Opposition to Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 97; grants in part and denies in part Defendants' Opposed Motion for Leave to Supplement Evidence in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 108; grants in part and denies in part Defendants' Objections to Plaintiff's Summary Judgment Evidence, Dkt. No. 87; and denies Defendants' Motion to Remove "Attorneys' Eyes Only" Designation from Certain Documents Produced by Plaintiff, Dkt. No. 101.

### a.  Leave to file a sur-reply

According to the undersigned's civil procedures, "once a motion, response, and reply are filed, the Court will not entertain any additional or supplemental filings unless they are accompanied by a motion for leave to file explaining why the additional filing is necessary in the interests of justice." L.R. 5.E. Pursuant to this local rule, Defendants have filed an opposed motion for leave to file a sur-reply to

Callidus's summary judgment motion, on the basis that, in its reply brief, Callidus has allegedly "raised a number of issues that were not initially set forth in [its] motion for summary judgment and has mischaracterized [Callidus's] counter-claims and affirmative defenses." Dkt. No. 97 at 2. In their motion, Defendants identify specific portions of Callidus's reply brief that they allege misconstrue Defendants' arguments or misstate facts in this case, and state their grounds for objecting as to each. *See* Dkt. No. 87. Without opining here on the merits of Defendants' sur-reply, the Court therefore finds that the interests of justice are served by, and little prejudice to Callidus will result from, granting Defendants' opposed motion to file this sur-reply.

### b. Objections to summary judgment evidence

Defendants' objections to Callidus's summary judgment evidence do not in fact object to evidence proffered by Callidus. Defendants instead assert that "[d]espite presenting eight pages of purported 'material facts,' [Callidus's] Motion for Summary Judgment fails to comply with the federal rules requirements to support its factual assertions with authenticated evidence." Dkt. No. 87 at 2. Defendants conflate two sub-sections of Federal Rule of Civil Procedure 56 here, 56(c)(1) and 56(c)(2), and misstate the requirement imposed by 56(c)(2). Rule 56(c)(1)(A) and (B) describe how "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1)(A)-(B).[7] Rule 56(c)(2), meanwhile, provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). It does not require the authentication of evidence, since "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be

---

[7] In its entirely, these subsections provide that, with respect to summary judgment motions: "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis original). The Court reads Defendants' objections, therefore, as alleging that certain of the "material facts" cited by Callidus: (i) are in fact genuinely disputed, and (ii) are unsupported by citations to materials in the record that could be presented in admissible form.

Defendants object to seven specific factual assertions made by Callidus in its motion for summary judgment. Dkt. No. 87 at 3-4. Defendants also object to two long series of paragraphs in this motion, on the basis that they are comprised solely of unsupported conclusory allegations. *Id.* at 4. It is beyond peradventure, as Defendants note, that "[m]ere conclusory allegations are not competent summary judgment evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). For this reason, with or without Defendants' objections to consider, the Court would account only for undisputed, material facts supported by competent evidence in analyzing the merits of Callidus's instant motion. Yet as Defendants have enumerated their objections to certain of Callidus's factual assertions and Callidus has responded to them, the Court will decide here which of these assertions Callidus has adequately supported pursuant to Rule 56(c)(1).[8]

The first two "unsupported statements" cited by Defendants regard ESCO's need for "non-conventional" financing "[d]ue to its precarious financial situation," and the "nearly $23 million" dollars loaned by Callidus to ESCO on execution of the Original Agreement. Dkt. No. 87 at 3. The Court finds that the key factual assertions of both of these statements are adequately supported by affidavits cited to by Callidus in its response to Defendants' objections. *See* Dkt. No. 92 at 2. The Court also notes that, in addition to affidavits, Callidus cites to statements made by Defendants in their own pleadings as support for its challenged statements. "Normally, factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers*, 720 F.2d 1391, 1396 (5th Cir. 1983) (citations and footnote

---

[8] The Court will not address Defendants' non-specific objections to "the entirety of Paragraphs 3-11 and Paragraphs 13-24" of Callidus's motion, as any allegations unsupported by citations to materials in the record will simply not be accounted for in the Court's analysis of undisputed material facts.

omitted). While a judicial admission itself is not evidence, "a judicial admission has the effect of withdrawing it from contention." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001); *see also Davis v. A.G. Edwards and Sons, Inc.*, 823 F.2d 105, 107 ("Facts that are admitted in the pleadings 'are no longer at issue.'") (quoting *Ferguson v. Neighborhood Housing Services, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986)). For all of these reasons, the Court overrules Defendants' objections to these first two assertions.

In the third factual assertion Defendants object to, Callidus claims that "ESCO failed to meet several of the conditions precedent to borrowing set forth in the Loan Agreement" after it was signed, "and sought various forbearances and accommodations from [Callidus] in order to continue borrowing."[9] Dkt. No. 87 at 3. Callidus does not cite to any materials in the record that could be admissible as evidence to support this assertion. Callidus does, however, cite to a statement from one of Defendants' pleadings that admits the Original Agreement "required that ESCO establish a hedging program" and that "ESCO had previously tried to establish such a program but failed due to its financial condition[.]"[10] Dkt. No. 92 at 3; Dkt. No. 29 at 4. The Court notes that Defendants also effectively admit in their amended counterclaims to never having established such a program. Dkt. No. 67 at 16. Yet section 19(a)(xii) of the Original Agreement, which stipulates that within 30 days of the closing of the agreement, "ESCO shall have entered into and implemented a metal commodity hedging program" is not explicitly listed as a "condition precedent" pursuant to section 15(a) of the Original Agreement, Dkt. No. 69-3 at 38, Ex. 3 at 33, and Callidus does not explain how this covenant might

---

[9] "Under Texas law, '[c]onditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance[.]" *Matter of Pirani*, 824 F.3d 483, 497 (5th Cir. 2016) (quoting *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)).

[10] The Court notes that in its amended complaint, Callidus additionally alleges that it "did not have an obligation to fund Facility F because [ESCO] never met the Section 15 conditions to borrowing because of insufficient financial statements (Section 15(a)(xii) or projections (Section 15(a)(xv))." Dkt. No. 64 ¶ 33. Yet Callidus does not reference these additional conditions precedent elsewhere in its pleadings, nor cite to any materials pursuant to its motion for summary judgment that would support its claim that ESCO failed to satisfy sections 15(a)(xii) and 15(a)(xv) of the Agreement.

otherwise come under the terms of this section.[11] *See* Dkt. 69-3 at 30-31, Ex. 3 at 25-26. Further, in the Amendment to the Original Agreement, signed by all parties, ESCO and the Defendants to this action represented that no default under the Agreement was ongoing at the date of signing. Dkt. No. 69-5 at 4; Dkt. No. 69, Ex. 4 at 3. The Court therefore sustains Defendants' objections to this third assertion.[12]

The fourth assertion Defendants object to states that "ESCO defaulted under the Loan Agreement" and its Amendment—an assertion the Court finds is adequately supported by affidavit, as well as citations to admissions made in Defendants' own pleadings. *See* Dkt. No. 92. In alleging ESCO's default, Callidus highlights section 23(e) of the Original Agreement, which states that an "Event of Default" will occur under the agreement when ESCO "does not deposit funds from any source" into a designated "Blocked Account," "or deposits any funds from any source into an account other than the Blocked Account." Dkt. No. 69-3 at 44, Ex. 3 at 39. In support of this allegation, Callidus cites to the affidavit of Wood, ESCO's former Vice President, which was attached as an exhibit to a pleading filed by ESCO and Defendants in the instant action. *See* Dkt. No. 92 at 3. In his affidavit, Wood states that following amendment of the Original Agreement "ESCO was forced to use some money to pay certain essential business expenses prior to depositing the money into the Blocked Account." *Id.*; Dkt. No. 29-1 at 4, Wood Aff. at ¶ 11. Callidus cites further to a pleading filed by Defendants admitting that ESCO was required to deposit all funds into the Blocked Account, that Callidus was not required to let ESCO use the funds it loaned on operating expenses, and that ESCO had not, in fact, deposited all funds provided by Callidus immediately into the Blocked Account as their agreement required. Dkt. No. 92 at 3. Whether

---

[11] The difference is not immaterial. *See Pirani*, 824 F.3d at 497 ("Because of their harshness in operation, conditions are not favorites of the law. . . [w]hen the intent of the parties is doubtful or where a condition would impose an absured [*sic*] or impossible result[,] then the agreement will be interpreted as creating a covenant rather than a condition.") (citations omitted.)

[12] In so doing the Court does not opine on whether, as Callidus alleges, Defendants ultimately failed to implement a hedging program. *See* Dkt. No. 69-6 at 3, Dkt. No. 69, Ex. 5 at 3. The Court simply sustains Defendants' objection to Callidus's assertion that, prior to the signing of the Amendment, ESCO had "failed to meet several of the conditions precedent to borrowing set forth in the Loan Agreement" and sought forbearance from Callidus, as this assertion is not supported by materials in the summary judgment record.

Defendants can offer an excuse or defense to breach, or successfully pinpoint a prior breach or repudiation on Callidus's part, is a separate inquiry from whether the challenged statement about ESCO's failure to deposit all funds in the Blocked Account is adequately supported here. The Court finds that it is, and overrules Defendants' objection to this fourth assertion.

The fifth assertion Defendants object to states that ESCO never paid its debts to Callidus, and that the Jaross and Levy Guarantors have not 'honored' their guaranties. Dkt. No. 87 at 4. As Callidus notes, the Jaross and Levy Guarantors have admitted to signing personal guaranties on ESCO's loans. Dkt. No. 92 at 4. These signed guaranties have also been submitted as evidence in support of Callidus's motion for summary judgment. *See* Dkt. No. 69-1 and 69-2. Defendants also object to Callidus's motion for partial summary judgment "on liability for a breach of contract claim related to the Guaranties" by alleging, inter alia, that "there is nothing owing on the Guaranties." Dkt. No. 88 at 30, 32. To the extent Defendants object to Callidus's statement on the basis that it asserts, as a conclusion of fact, that the Jaross and Levy Guaranties are enforceable for a certain sum, the Court sustains Defendants' objection to this statement. Yet to the extent Defendants object to the assertion that they guaranteed the Original Agreement and Amendment, or the claim that they have not paid Callidus pursuant to their Guaranties, their objection is overruled.

The sixth assertion Defendants object to states that ESCO filed for bankruptcy on March 7, 2015 "to avoid [a] receivership hearing." Dkt. No. 87 at 4. The Court will not consider the intent Callidus imputes to ESCO here, but does take judicial notice of the bankruptcy filing, overruling in part Defendants' objection. Finally, the seventh assertion Defendants object to states that the Amendment to the Original Agreement signed by the parties was bargained for at "arms' length between sophisticated parties." Dkt. No. 87 at 4. The Court overrules Defendants' objection to this statement, as the Jaross and Levy Guarantors are

industry specialists[13] who actively negotiated the terms of their Guaranties with Callidus.[14]

### c. Leave to supplement evidence

Defendants seek leave to supplement under Local Rule 5.E evidence of "internal communications and memorandum" only recently provided by Callidus through discovery. Dkt. No. 108. Callidus represents that—granting conformity with an agreed protective order, Dkt. No. 94, which designates these documents either as "confidential" or "for attorneys' eyes only"—it does not object to Defendants supplementing the record, but does object to how Defendants have characterized the relevance of the additional evidence they seek to admit. *See* Dkt. No. 112. The Court therefore construes Callidus's response as objecting to Defendants' assertions on the basis that they are unsupported by the material they cite to, contrary to the requirements of Rule 56(c)(1). Accordingly, the Court grants Defendants' motion for leave to supplement, but will also directly address Callidus's objections here.

Defendants' first factual assertion reads: "Defendants made clear and Callidus understood that ESCO's financial needs required the at-issue loan be closed quickly." Dkt. No. 108 at 2. The Court overrules Callidus's objection to this statement, finding it is adequately supported by the newly admitted materials to which Defendants cite. Callidus alleges that Defendants' own conduct was to blame for "the delay in completing the loan," Dkt. No. 112 at 1, but even if true, this statement has no bearing on what Callidus knew about the necessary timing of the loan ESCO required. The evidence is undisputed that an internal report prepared by Callidus as it was contemplating a deal with ESCO states that "[ESCO] needs a

---

[13] R. Jaross was a long-time CEO and President of ESCO, while E. Jaross was an ESCO shareholder who additionally has stipulated that she and her husband Richard had run ESCO "as owners and/or operators, since its founding in 1996." *See* Dkt. No. 88, Exs. 1 and 2. Meanwhile, "Levy, who guaranteed $600,000 of the ESCO debt, is an attorney licensed in New York with a bachelor's degree from Yale and a law degree from Harvard," Dkt. No. 91 at 1, was a "significant shareholder" and a Director at ESCO before becoming its CEO in 2014. *See* Dkt. No. 88, Ex. 3.

[14] *See, e.g.,* Dkt. No. 88 at 33, Ex. 4 at 122-125, Dep. of Mark Wilk, recounting an email exchange between Levy and Callidus management, in which Levy raises issues regarding the personal guarantees and interest rates proposed by the Original Agreement, weeks before it was ultimately signed.

fast close," Dkt. No. 109 at 32 (Callidus 0097349). Defendants have also cited to an email sent by Levy (one of the defendant Guarantors in this action) informing Callidus months before it signed the Original Agreement with ESCO that it was "imperative" the parties "proceed expeditiously" in making a deal, Dkt. No. 109 at 46 (Callidus 0097756).

Defendants' second objected-to assertion reads: "Although Callidus represented that personal guaranties of the principles would not be required, Plaintiff knowingly contemplated personal guaranties from the start." Dkt. No. 108 at 2. Callidus objects that this statement is not supported by the material cited to by Defendants. The Court agrees that the specific document Defendants cite to is insufficient to support the allegation that Callidus contemplated personal guaranties, and sustains Callidus's objection to this assertion.

The third and final statement from Defendants' motion to supplement that Callidus objects to alleges that "Callidus understood that funding of the purchase *and* towing of the Saratoga, the Shenandoah, and the Yellowstone (the "Vessels") was essential to ESCO's financial health and [Callidus], in fact, agreed to fund the towing of the vessels." Dkt. No. 108 at 2 (emphasis original). Defendants have cited to adequate materials in the summary judgment record to support the assertion about Callidus's understanding. Defendants cite to a Callidus email noting that ESCO's profitability hinged on the award of the Saratoga, Dkt. No. 109 at 24 (Callidus 0096857-58), and to a company memorandum on the total costs affiliated with the purchase, dismantling, and sale of the Saratoga that explicitly contemplates "tow and arrival costs," Dkt. No. 109 at 5 (Callidus 0096746). Defendants cite to an unsigned internal Callidus memorandum noting that the award of the Shenandoah and the Yellowstone was key to ESCO's ability "to operate profitably," and which contemplated extending a loan facility to ESCO that would have covered "acquisition, towing, and cleaning costs of the two new vessels," Dkt. No. 109 at 19 (Callidus 0096811). Finally, Defendants cite to a Callidus memorandum signed by the company's credit committee days before the Original Agreement was executed that includes "towing and purchase costs" in Callidus's

calculation of how much money ESCO would be able to borrow under the parties' eventual loan agreement. Dkt. No. 109 at 20 (Callidus 0096812). What Defendants have not definitively shown through citation to materials in the record, however, is that Callidus "in fact agreed" to fund towing costs for all three of these vessels—although the Court acknowledges Defendants' claim that the Original Agreement should have provided enough funding to cover this cost, Dkt. No. 88 at n.6, and notes that towing costs for the Shenandoah and the Yellowstone are explicitly provided for in section 1.4 of the Amendment. Dkt. No. 69-5 at 3.

### d. Motion to remove "attorneys' eyes only" designation

As to Defendants' motion to remove the "attorneys' eyes only" designation from certain documents produced by Callidus, the Court finds no good cause to grant this motion. The parties stipulated to an agreed protective order that gives Callidus discretion to label documents either "confidential" or "for attorneys' eyes only" as long as a document meets certain criteria justifying heightened protection. *See* Dkt. No. 94. Defendants move to have the "attorneys' eyes only" designation removed from 51 documents provided by Callidus in recent discovery, on the basis that the inability of individual Defendants to "review and potentially contravene information included in these documents would detrimentally affect their ability to defend [Callidus's] claims and prosecute their own." Dkt. No. 101 at 3. Callidus answers that it has discretion under the protective order to label these documents as "for attorneys' eyes only;" that Defendants have not alleged that this designation is inappropriate under the terms of the protective order; that Defendants fail to cite to a specific or serious harm that results from this designation; and that the protective order cannot prevent Defendants' counsel from conveying to their clients, in a general way, the contents of documents designated "for attorneys' eyes only." *See* Dkt. No. 110. Defendants' counsel have demonstrated in their motion a sufficient ability to understand the import of documents marked "attorneys eyes only" to the litigation prerogatives of their clients. Additionally, the parties' protective order does not prevent Defendants' counsel from rendering advice to Defendants that conveys a general evaluation of the contents of protected material.

Therefore, absent a showing of specific and prejudicial harm to Defendants from the use of this designation with respect to the specific contents of particular documents the Court finds that good cause does not exist, at this time, to modify the parties' agreed protective order.

## IV. Callidus's Pending Summary Judgment Motions
### a. Summary Judgment Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must view all evidence in the light most favorable to the non-moving party. *Brumfield*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc, per curiam).

The party moving for summary judgment bears the "burden of showing this Court that summary judgment is appropriate." *Brumfield*, 551 F.3d at 326 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden of production a party must initially carry depends upon the allocation of the burden of proof at trial. *See Shanze Enters., Inc. v. Am. Cas. Co. of Reading*, 150 F.Supp.3d 771, 776 (N.D.Tex. 2015) ("Each party's summary judgment burden depends on whether it is addressing a claim or defense for which it will have the burden of proof at trial.") "Thus, if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant

judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis original).

"Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Celotex*, 477 U.S. at 325). In other words, when a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The non-movant's burden is not satisfied by "conclusory allegations," "unsubstantiated assertions," or "by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and mandates the entry of summary judgment for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)) (citations omitted).

### b. Analysis

Callidus filed suit against Defendants in order to recover payments, fees, and costs it claims it is owed under the Jaross and Levy Guaranties. Dkt. No. 69 at 1. In its instant motion, Callidus seeks summary judgment as to Defendants' amended counterclaims and affirmative defenses, as well as to the first count of Callidus's amended complaint, which alleges that Defendants have breached the Jaross and Levy Guaranties. *See* Dkt. No. 69. Specifically, Callidus alleges that Defendants' claims are completely barred as a result of ratifications and releases they made pursuant to the Amendment, and that, as a matter of law, Defendants cannot avail themselves of any fraudulent inducement, economic duress, or unconscionability claims. *Id.* In the alternative, Callidus argues that Defendants' counterclaims are derivative of ESCO's claims resolved in bankruptcy, and are for this reason

impermissible. *Id.* Callidus further urges that if the Court grants its request for summary judgment as to Defendants' claims, it should also hold that Defendants have materially breached, and are liable under, the Jaross and Levy Guaranties. *Id.*

Defendants respond that the Amendment to the Original Agreement is not enforceable for lack of consideration, or, in the alternative, that its enforceability is affected by a failure of consideration, as a result of Callidus's breach of the Amendment. *See* Dkt. No. 88. Accordingly, Defendants disclaim the release language contained in this Amendment, and the allegation that the Amendment ratified Callidus's performance under the Original Agreement. *Id.* Yet they also claim, additionally and independently, that this language is legally ineffective. Specifically, Defendants argue that the Amendment's release language is insufficient under Texas law to bar their fraudulent inducement and unconscionability claims, and that Callidus cannot show facts demonstrating they effectively ratified the Original Agreement by signing the Amendment. *Id.* Defendants further argue that genuine issues of material fact exist as to their fraud, economic duress, and unconscionability claims sufficient to preclude the summary judgment Callidus seeks. *Id.* Defendants also deny that their claims are solely derivative of ESCO's bankruptcy claims, asserting instead that their claims as guarantors of ESCO's debts are personal and direct, and resulted in harms particular to them. *Id.* Finally, Defendants argue that Callidus has not even attempted to make out a breach of contract claim pursuant to the Jaross and Levy Guaranties that would justify granting summary judgment in Callidus's favor. *Id.*

### i. Defendants' liability under the Jaross and Levy Guaranties (Count I of Callidus's Amended Complaint)

Callidus urges the Court to find Defendants are liable to Callidus on the Jaross and Levy Guaranties based on their "plain and unambiguous language." Dkt. No. 69. Defendants respond that such relief would be inappropriate on the basis of Callidus's motion for summary judgment, both because it fails to even name the essential elements of a breach of guaranty claim and because "there is evidence

before the Court that [Callidus] materially breached the [Original Agreement]." Dkt. No. 88 at 39-40.

In Texas, "[a] plaintiff who sues for recovery on a promissory note does not have to prove all essential elements for a breach of contract but rather need only establish the note in question, that the defendant signed it, that the plaintiff was the legal owner and holder thereof, and that a certain balance is due and owing on the note." *Rockwall Commons Associates, Ltd. v. MRC Mortg. Grantor Trust I*, 331 S.W.3d 500, 505 (Tex.App.–El Paso 2010, no pet.); *see also Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720 (Tex.App.–San Antonio 2004, no pet.) ("To support a claim for breach of a guaranty, a party must show proof of (1) the existence and ownership of a guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the failure or refusal to perform by the guarantor.") Texas law "recognizes two distinct types of guaranty: a guaranty of collection (or conditional guaranty) and a guaranty of payment (or unconditional guaranty)." *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex.App.–Houston 1997, no pet.). "[A] guaranty of payment is an obligation to pay the debt when due if the debtor does not and requires no condition precedent to its enforcement against the guarantor other than a default by the principal debtor." *Chahadeh v. Jacinto Medical Group, P.A.*, 2017 WL 976071 at *3 (Tex.App.–Houston 2017.).

In support of its motion for summary judgment Callidus submits copies of the executed Jaross and Levy Guaranties, demonstrating the existence of these Guaranties and its ownership of them. Dkt. Nos. 69-1, 69-2. Callidus also submits copies of the Original Agreement and its Amendment, signed by the Jaross and Levy Guarantors. Dkt. No. 69-3. The Original Agreement specifically references the Guarantors' obligations under the contract as "limited guarant[ies] of payment" of "up to a maximum amount" of $2,000,000 in the case of the Jaross Guarantors, and $600,000 in the case of the Levy Guarantors. Dkt. No. 69-3 at 28. Additionally, the Jaross and Levy Guaranties each warrant that they are "a guaranty of payment as to monetary obligations and not of collection." Dkt. Nos. 69-1 ¶ 7, 69-2 ¶ 7. They

also note the Guarantors are not entitled to assert a setoff or reduction defense, and that their obligations will not be diminished in the event of ESCO's bankruptcy. Dkt. Nos. 69-1 ¶ 9, 69-2 ¶ 9. Finally, each Guarantor agrees to fulfill his obligation under the Guaranties, "until [ESCO's] obligations are indefeasibly paid in full," on demand and in the event of ESCO's default under the Agreement. Dkt. Nos. 69-1 ¶¶ 1, 3, 10, 69-2 ¶¶ 1, 3, 10. Callidus submits the affidavit of Wood attesting to ESCO's failure to deposit all funds advanced by Callidus into a Blocked Account, which constitutes a breach by ESCO of the Original Agreement. *See* Dkt. No. 29-1, Aff. of Wood at ¶ 11. Callidus also submits copies of letters it sent to ESCO and the Jaross and Levy Guarantors demanding payment of ESCO's debt as a result of ESCO's default. Dkt. Nos. 69-6 and 69-7. Finally, the fact that the Jaross and Levy Guarantors have failed to perform under the Guaranties is not a matter of disputed fact.

However, despite the undisputed fact that the Guarantors have failed to perform under the Guaranties, Callidus has not met its burden to show it is entitled to summary judgment as to the liability of the Jaross and Levy Guarantors. Defendants have pled a fraudulent inducement affirmative defense as to the enforceability of the Guaranties sufficient to survive summary judgment. For this reason, Callidus's motion for summary judgment as to Count I of its amended complaint is denied.

### ii.   Enforceability of the Amendment

Callidus seeks a declaration that Defendants' counterclaims and affirmative defenses are completely barred on the basis that the Amendment released certain claims Defendants might otherwise have raised, and ratified the Original Agreement. As an affirmative defense to enforcement of the Amendment's terms, Defendants argue that the Amendment lacked consideration at its inception, and, in the alternative, that a failure of consideration occurred when Callidus refused to perform under this Amendment. *See* Dkt. No. 88 at 14-16.

Consideration is a fundamental element of every valid contract." *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex.App.–Tyler 2010, no pet.). It consists of "either a

benefit to the promisor or a loss or detriment to the promisee." *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998). "Consideration is a present exchange bargained for in return for a promise." *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). Accordingly, consideration is required not only to create an enforceable agreement, but also to render modifications to contracts enforceable. *Barnhill v. Moore*, 630 S.W.2d 817, 820 (Tex.App.–Corpus Christi 1982, no pet.) ("To modify an existing contract, consideration is required[.]") *See also Travelers Indem. Co. v. Edwards*, 451 S.W.2d 313, 317 (Tex.Civ.App.–El Paso 1970) ("[U]nder general principles of contract law, the modification of an existing contract imposing heavier burdens on one of the contracting parties must be supported by an additional consideration.")[15]

"A contract that lacks consideration lacks mutuality of obligation and is unenforceable." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997). "Lack of consideration for a contract is an affirmative defense to its enforcement[.]" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex.App.–Houston 2011, no pet.) "A lack of consideration occurs when a contract, at its inception, does not impose obligations on both parties." *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 747 (Tex.App.–Dallas 2012, no pet.). Failure of consideration, too, is an affirmative defense. *See Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 485 (Tex. 2016); *McGraw v. Brown Realty*, 195 S.W.3d 271, 276 (Tex.App.–Dallas 2006) ("A complete failure of consideration constitutes a defense to an action on a written agreement.") "[F]ailure of consideration occurs when, because of some supervening cause arising after the contract is formed, the promised performance fails." *Cheung-Loon, LLC*, 392 S.W.3d at 747.

---

[15] These principles apply equally to guaranties backing underlying contracts entered into contemporaneously with these contracts. *See First Commerce Bank v. Palmer*, 226 S.W.3d 396, 398 (Tex. 2007) ("If the guarantor's promise is given as part of the transaction that creates the guaranteed debt, the consideration for the debt likewise supports the guaranty."); *see also Barclay v. Waxahachie Bank & Trust Co.*, 568 S.W.2d 721, 724 (Tex.Civ.App.–Waco 1978, no pet.) ("It is not necessary that consideration for the guaranty pass to the guarantor, for it is sufficient consideration if the primary debtor receives some benefit.")

In all cases, "there is a presumption that a written contract is supported by consideration," and in general, the burden to show otherwise is on the party pleading lack or failure of consideration. *ABB Kraftwerke Aktlengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 292 (Tex.App.–Corpus Christi 2003, pet. denied.); *see also Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 107 (Tex.App.–Dallas, 1987, no pet.) ("[W]here a contract of guaranty is in writing and signed by the guarantor, its existence imports a consideration.") Yet "parol evidence is admissible to show want or failure of consideration and establish the actual consideration given for the instrument." *McLernon*, 347 S.W.3d at 335.

## 1. Lack of Consideration

As to whether the Amendment lacked consideration, Defendants allege that the Amendment did not impose any new legal obligations on Callidus, but instead, mischaracterized Callidus's pre-existing duties under the Original Agreement as new concessions. Specifically, Defendants argue that ESCO, and by extension the Jaross and Levy Guarantors, "gained nothing by the First Amendment" because Callidus should have advanced $3,500,000 pursuant to Facility F under the Original Agreement, but purported to make this advance discretionary in the terms of the Amendment. Dkt. No. 88 at 25. It is Defendants' burden to show that the Amendment lacks consideration if they seek to avoid ratification and the release language the Amendment contains. At the summary judgment stage, as Callidus is the movant, Defendants are therefore required to show at least a genuine dispute of material fact as to whether the Amendment lacks consideration.

Section 5(a) of the Original Agreement requires that "[o]n the Effective Date, [Callidus] shall advance, and [ESCO] shall borrow the collective amount of Twenty-Two Million, Six Hundred Thousand Dollars ($22,600,000) under Facility B Loan, Facility C Loan, Facility D Loan, and Facility F Loan[.]" Dkt. No. 69-3 at 21, Ex. 3 at 16. The Original Agreement defines "Effective Date" as "[t]he date of satisfaction of all conditions precedent," which are enumerated and described at section 15(a) of the contract. Dkt. No. 69-3 at 30, Ex. 3 at 25. The "Facility F Loan" is defined at section 2(f) of the Original Agreement as "[a] demand single advance non-revolving

loan facility in the maximum principal amount of up to Three Million, Five Hundred Thousand Dollars ($3,500,000)." Dkt. No. 69-3 at 19, Ex. 3 at 14. The Amendment alters these terms. Specifically, it removes Facility F from section 5(a) of the Original Agreement. *See* Dkt. No. 69-5, Ex. 4. It also states that on the Effective Date Facility F is to be funded in the amount of "$1,111,208.85," and states that "all releases of funds under Facility F are discretionary." *See id.*

Callidus argues that "allowing Esco to immediately access an additional $1.11 million in funding" under the revised "Facility F Loan" provided by the Amendment constituted consideration.[16] Dkt. No. 69 at 11. Callidus additionally argues that because the Amendment established that all loans advanced by Callidus were "discretionary," and because all of the loans contemplated by the Original Agreement and Amendment were "demand loans" callable by Callidus at any time, its decision to loan money to ESCO and forbear calling its loans was consideration. Dkt. No. 91 at 2-3. Finally, Callidus asserts that consideration existed to support the Amendment as a result of "changes to the 'borrowing base' formulas set forth in the [Original Agreement] to make them more favorable to ESCO." *Id.* at 3.

Defendants argue that  the Facility Loan F did not constitute consideration for the Amendment, as it was required under the Original Agreement. In support of this argument, they cite to the affidavits of Jaross Guaranty signatories R. and E. Jaross, each of whom state that "Plaintiff refused and failed to advance the $3,500,000" provided for by the Facility F Loan under the Original Agreement. *See* Dkt. No. 88 at 16; Dkt. No. 88-1 at 4, R. Jaross Aff. at ¶ 14; Dkt. No. 88-2 at 3-4, E.

---

[16] In its reply brief filed subsequent to Defendants' response to its summary judgment motion, Callidus references a larger loan figure in arguing that the Amendment was supported by consideration. Namely, Callidus notes that "Plaintiff loaned ESCO an additional $3,910,852.22 million in reliance on the First Amendment" after it was signed, and cites to the affidavit of David Reese, Callidus President and COO to support this claim. Dkt. No. 91 at 2. Yet the affidavit and its attached Exhibit do not support the contention that the full $3.9 million advanced after the Amendment was signed was newly provided for by the Amendment, as opposed to by the terms of the Original Agreement. *See* Dkt. 91-2, Ex. 2, Aff. of Reese. As such, and given Callidus's initial summary judgment claim that the Amendment did not lack consideration because it "allowed ESCO to immediately access an additional $1.111 million in funding from [Callidus] ESCO would otherwise not have been able to access," Dkt. No. 69 at 11, the Court will account only for this $1.111 million in funding in considering whether loans made pursuant to the Amendment constitute consideration.

Jaross Aff. at ¶ 9. Defendants also cite to email correspondence between Callidus management and counsel for ESCO suggesting that by mid-September, 2014, more than two months after the Original Agreement was signed, Callidus had, by its own admission, not loaned funds under Facility F. *See* Dkt. No. 88-15 at 8 (Callidus 0076344). Indeed in this correspondence Callidus suggests that it had no obligation to loan these funds, on the basis that the "Effective Date" under the Original Agreement on which it was to transfer the Facility F Loan had never occurred, as a result of ESCO's alleged failure to satisfy certain "conditions precedent" under section 15(a) of the Original Agreement. *See* Dkt. No. 88-15 at 8, Ex. 15. Yet, as discussed herein, including at n.8, Callidus has not cited to materials in the record to support its claim that ESCO failed to satisfy any condition precedent under the Original Agreement.[17] Additionally, while in its summary judgment pleadings Callidus does not directly address Defendants' argument that it was required to advance funds under Facility F pursuant to the Original Agreement, Callidus admits in its amended complaint that it "did not fund Facility F" on the date it funded all other 'demand single advance non-revolving loan facilities' provided for in section 5(a) of the Original Agreement, and instead "ma[de] up the difference through the revolver," i.e. the Facility A Loan, presumably after the Amendment was signed. Dkt. No. 64 ¶¶ 18, 32. Accordingly, the Court finds that Defendants have carried their burden at this summary judgment stage to show that a genuine dispute of material fact exists as to whether any Facility F Loan funds transferred under the Amendment constitute consideration for the Amendment. *See McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 93 (5th Cir. 1995) ("In general, under the 'pre-existing duty rule,' an agreement to do what one is already bound to do cannot serve as 'sufficient consideration to support a supplemental contract or modification'") (quoting *Signs v. Bankers Life & Casualty Co.*, 340 S.W.2d 67, 73 (Tex.App.–Dallas 1960, no pet.); *see also Trevino & Gonzalez*, 949

---

[17] Indeed, materials cited by Defendants suggest that Callidus may not even have communicated to ESCO, when the company inquired, which condition precedent to the Original Agreement it allegedly failed to satisfy. *See* Dkt. No. 88-15 at 8 (Callidus 0076344).

S.W.2d 39, 42 (Tex.App.–San Antonio 1997, no pet.) ("The discharge of a duty one is already bound to perform is not consideration.")

Callidus also argues that the Amendment is supported by consideration because it "made a number of changes to the 'borrowing base' formulas set forth in the [Original Agreement] to make them more favorable to ESCO." Dkt. No. 69 at 11; *see also* Dkt. No. 91 at 3. In support of this statement Callidus points to three separate provisions of the Amendment: 1.2, 1.3, and 1.4. On review of the Amendment and the Original Agreement, the Court notes that section 1.3 of the Amendment does not actually revise, as it purports to, section 3(e) of the Original Agreement. Sections 1.2 and 1.4 of the Amendment, however, do contain revised terms that both appear to increase the borrowing base applicable to the revolving "Facility A Loan" contemplated by the Original Agreement.[18] Under Texas law, the restructuring of existing debt can confer a benefit constituting consideration on a guarantor. *See Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 107 (Tex.App.–Dallas 1987, writ ref'd n.r.e.).[19] Enlarging the borrowing base and consequently, the size of the loans potentially available to ESCO, might therefore feasibly constitute consideration under the Amendment. Yet Defendants have raised a question of fact as to whether the two provisions of the Amendment enlarging the borrowing base under Loan Facility A actually conferred a new benefit on ESCO, or simply accounted for funds Callidus was already bound to loan under the Original Agreement. Defendants admit that at least section 1.4 of the Amendment purported to make material changes to ESCO's borrowing base. Dkt. No. 88 at 18 ("*See* [Amendment] at 1.4 (adding towing costs to available funds under Facility A in [the Original Agreement].") But they allege that Callidus "agreed to do nothing by the

---

[18] Specifically, section 1.2 amends section 3(d) of the Original Agreement to increase the percentage of nonferrous metal "Eligible Finished Goods Inventory" accounted for in calculating the maximum loan amount available to ESCO under the Facility A Loan, while section 1.4 amends section 3(g) of the Original Agreement to increase the percentage of costs resulting from the acquisition and towing of two ships, the USS Shenandoah and the USS Yellowstone, accounted for in this calculation. *Compare* Dkt. No. 69-5 at 5 with Dkt. No. 69-3 at 20.

[19] Often, such restructuring extends the repayment term for a loan obligation. *See First Commerce Bank*, 226 S.W.3d at 398-99; *McLernon*, 347 S.W.3d at 335. In this case, however, the Amendment actually shortened the repayment term for loans contemplated by the Original Agreement and Amendment. *Compare* Dkt. No. 69-5 at 3, section 1.6 with Dkt. No. 69-3 at 23, section 7.

[Amendment] other than what it was already contractually obligated to do (loan certain funds)." Dkt. No. 88 at 11.

To support this assertion, Defendants cite to the affidavit of R. Jaross, in which he states that if Callidus "had funded [Facility Loan F] of $3.5M and had advanced 80-85% of receivables under Facility A, ESCO would have had plenty of funds to purchase and tow the two Vessels [the USS Shenandoah and the USS Yellowstone] without any need for the amendment to the [Original Agreement]." Dkt. No. 88-1 at 5, R. Jaross Aff. at ¶ 19. Defendants also cite to an internal Callidus memorandum, Dkt. No. 109 at 21 (Callidus 0096813), and an email sent from Craig Boyer, a former Callidus Vice President, to Levy, Dkt. No. 88-5 at 2 (Callidus 008908), which both understate the amount of funding Callidus was obligated to advance under Facility A. *See* Dkt. No. 69-4 at 20, section 3(d). Callidus's borrowing base calculations under sections 1.2 and 1.4 of the Amendment directly affected the availability of funds to ESCO under Loan Facility A, and were revised in the Amendment in part to account for the advance of Funds under Facility F.[20] Accordingly, if the advance of funds under Facility Loan F cannot constitute consideration, neither can changes to the borrowing base made pursuant to sections 1.2 and 1.4 of the Amendment. The Court therefore finds that Defendants have identified genuine issues of material fact as to whether changes to the borrowing base calculations in sections 1.2 and 1.4 of the Amendment constitute consideration.

Callidus also argues that its decision to loan funds that were made universally "discretionary" by the terms of Amendment constitutes consideration. The language of the Amendment itself, however, does not support this argument. In support of its position, Callidus cites to section 6.1 of the Amendment, which reads, in pertinent part: "This is a discretionary loan, and Lender may place reserves upon any facility under the Loan Agreement[.]" Dkt. No. 69-5 at 6; Dkt. No. 69, Ex. 4 at 5.

---

[20] Callidus acknowledges this relationship between the borrowing base calculations and funds available to Defendants under Facility Loans A and F in its amended complaint, where it states: "Per Section 2.1 of the Amendment, [Callidus] did fund Facility F by transferring money from the revolver [i.e. Facility Loan A] to Facility F, opening up availability for ESCO to purchase and tow the two new ships." *See* Dkt. No. 64 at ¶ 18.

Yet this section of the Amendment is entitled "Release and Covenant Not to Sue," and does not substantively address the terms of loans referenced elsewhere in the document or in the Original Amendment—whereas in other sections, Callidus's purported discretionary authority as a lender under the Amendment is referenced in much more specific terms, and in relation to particular, named loan facilities. Section 2.1, for instance, states that "all releases of funds under Facility F loan are discretionary by Lender," while section 1.5, which modifies section 5(a) of the Original Agreement, states that "Lender may in its discretion" advance funds under Facility Loans B through E. *See* Dkt. No. 69-5; Dkt. No 69, Ex. 4. By contrast, no particular reference to discretion is made in section 3(g) of the Original Agreement, as purportedly modified by section 1.4 of the Amendment, which establishes the maximum amount Callidus will loan under the Facility A Loan.[21] Under Texas law, a court construing a written contract must "consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Hackberry Creek Country Club, Inc. v. Hackberry Creek Homeowners Ass'n*, 205 S.W.3d 46, 54 (Tex.App.–Dallas 2006). Where provisions of a contract "arguably conflict, Texas courts employ canons of construction as tools to harmonize them." *Matter of Pirani*, 824 F.3d 483, 494 (5th Cir. 2016). "Those canons include the rules that (1) specific provisions control over general provisions; (2) provisions stated earlier in an agreement are favored over subsequent provisions; and (3) the interpretation of an agreement should not render any material terms meaningless." *Id.* (citations omitted.) All three of these canons refute Callidus's interpretation of section 6.1 of the Amendment as a grant of overriding 'express discretion' to refuse to loan any funds under the Original Agreement and Amendment, as (1) this is a general provision in a contract containing more specific references to discretion, (2) which appears later in the Amendment than these other references, and (3) finding that this term

---

[21] Further, as Defendants note, the terms of this Facility A Loan were specifically revised in the Amendment to account for "one hundred percent (100%)" of the costs relating to the acquisition of the USS Shenandoah and the USS Yellowstone, "and for transportation thereof[.]" *See* Dkt. No. 69-5 at 3; Dkt. No 69, Ex. 4, Amendment at section 1.4.

applies universally to the entire Amendment would obviate the need for its other references to discretion. The Court therefore finds, as a matter of law, that Callidus's decision to make loans to ESCO pursuant to the Amendment notwithstanding section 6.1's references to discretion does not constitute consideration.

Finally, Callidus also alleges that its decision to forbear collecting on its loans to ESCO constitutes consideration. Under Texas law, "[a] forbearance of any legal right may be a consideration." *Security Drilling Co. v. Rathke Oil Co.*, 41 S.W.2d 1019, 1022 (Tex.Civ.App.–1931, pet. denied). Yet "forbearance by the creditor to sue is not consideration, unless based upon an agreement to that effect." *Travelers Indem. Co.*, 451 S.W.2d at 317 (citing *Wilkins v. Carter*, 19 S.W. 997 (Tex. 1892)) ("The mere omission of the creditor to sue is not sufficient, in the absence of such agreement, for in such case he may proceed at his pleasure.") Callidus has not established that it had demanded payment on any loan at the time the Amendment was signed, and by the terms of the Amendment Defendants represent that no default or "Event of Default" had occurred or was continuing as of the date it was signed. Dkt. No. 69-5 at 4, section 3.4 Additionally, the Amendment's terms do not provide for forbearance on the collection of any loan. *See* Dkt. No. 69-5, Ex. 4. The Court therefore finds, as a matter of law, that Callidus's decision to forbear on the collection of demand loans made to ESCO prior to signing the Amendment does not constitute consideration.

As Defendants have identified material, disputed fact issues as to each of the possible grounds for consideration supporting the Amendment Callidus has offered, they have met their burden at this summary judgment stage to support their invocation of the affirmative defense of lack of consideration.

## 2. Failure of Consideration

Defendants have also alleged that, even if the Amendment does not lack consideration, Callidus "materially breached" the Amendment when it did not advance funds to tow the USS Shenandoah and the USS Yellowstone—and that this alleged breach constituted a failure of consideration. Dkt. No. 88 at 25. Yet as the

Court has already found that Defendants have sufficiently identified a genuine dispute of material fact as to the enforceability of the Amendment pursuant to their lack of consideration defense, the Court declines to address here Defendants' additional allegation regarding failure of consideration as to the Amendment.

### iii.   Ratification and release

Callidus argues that the releases the Levy and Jaross Guarantors signed in the Amendment, and the Amendment's ratification of the Original Agreement, act as a "complete bar" to their counterclaims and affirmative defenses. Dkt. No. 69 at 7. Yet as Defendants have shown that a genuine dispute of fact exists as to the enforceability of the Amendment, Callidus is not entitled to summary judgment on its ratification or release claims. The Court declines at this summary judgment stage to find, as Callidus requests in its instant motion, that Defendants' counterclaims and affirmative defenses are per se barred as a result of their "express ratification of the Loan Agreement and their Guaranties, and/or by [their] express releases of those claims/affirmative defenses" under the Amendment. *See* Dkt. No. 69 at 6. Similarly, the Court declines to consider Defendants' argument that the release language of the Amendment is insufficient as a matter of Texas law to effectively bar any fraudulent inducement or unconscionability claims Defendants seek to bring, or to analyze here whether the Amendment did, as a matter of law, ratify the Original Agreement.

### iv.   Defendants' Fraudulent Inducement, Duress, and Unconscionability Counterclaims

In their amended counterclaims, Defendants bring fraudulent and inducement and breach of contract claims against Callidus, and seek declaratory judgment that the Original Agreement, its Amendment, the Jaross and Levy Guaranties, and other loan documents implicated in this litigation are void or unenforceable as a result of fraudulent inducement, economic duress, and unconscionability. Dkt. No. 67 at 13. Callidus argues that, separate from Defendants' release and ratification of their claims pursuant to the Amendment, Defendants cannot, as a matter of law, avail themselves of any fraudulent

inducement, economic duress, or unconscionability counterclaims or affirmative defenses with respect to the Original Agreement and the Amendment. Accordingly, Defendants must raise a fact issue as to each element of these claims for each to survive summary judgment.

### 1. Fraudulent Inducement

"Fradulent inducement . . . involves a promise of future performance made with no intention of performing at the time it was made." *Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving and with no intention of performing the act.") "Fraudulent inducement 'is a particular species of fraud that arises only in the context of a contract.'" *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015). "A party asserting that it was fraudulently induced into entering an agreement must show that (1) the other party made a material representation, (2) the representation was false and was either known to be false when made or made without knowledge of its truth, (3) the representation was intended to be and was relied upon by the injured party, and (4) the injury complained of was caused by the reliance." *In re Int'l Profit Associates, Inc.*, 274 S.W.3d 672, 678 (Tex. 2009). While typically the clear terms of a contract control its interpretation, in Texas "extrinsic evidence is permissible to show fraud in the inducement of a note" where there is "a showing of some type of trickery, artifice, or device employed by the payee." *Town North Nat. Bank v. Broaddus*, 569 S.W.2d 489, 494 (Tex. 1978).

Defendants' fraudulent inducement claim is based on the allegation that Callidus represented "it had no intention of owning ESCO's assets" when its true intent "was to strip ESCO of its assets." Dkt. No. 67 at 9. More specifically, Defendants allege that Callidus made extrinsic misrepresentations relating, for instance, to Callidus's alleged claims that it could loan funds quickly to ESCO without personal guaranties, as well as "misrepresentations in the loan documents themselves" relating to the amount of funds Callidus agreed to transfer under the

Original Agreement. *Id.* at 10. Callidus argues that such allegations cannot be sustained as a result of the Amendment's release and ratification of these claims, but does little to address Defendants' fraudulent inducement claim as to the Original Agreement.[22] Callidus does, however, detail clauses contained in the Jaross and Levy Guaranties in which Defendants "expressly waived all suretyship and guarantor's defenses generally," and agreed that their Guaranties were fully enforceable irrespective of claims ESCO could assert, including "fraud." Dkt. No. 69 at 10. Additionally, the Court notes that the Jaross and Levy Guaranties also contain a general merger clause, as well as a clause in which each Guarantor "represents and warrants that he or she has relied exclusively on his or her own independent investigation of Borrower and the collateral for his or her decision to guaranty" ESCO's debt. *See* Dkt. Nos. 69-1 at 5-7, 69-2 at 5-7.

"Though a valid fraudulent inducement claim generally precludes parties from relying on a contract's terms, including its releases, the contract itself may preclude a valid fraudulent inducement claim if it (1) clearly expresses the parties' intent to waive fraudulent inducement claims," or (2) "disclaims reliance on representations about specific matters in dispute." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 369 (Tex.App.–Houston 2012, pet. granted, judgm't vacated w.r.m.). As to this second basis for finding that a contract precludes a fraudulent inducement claim, the Texas Supreme Court has established a standard for assessing the effect of "disclaimer-of-reliance" clauses that requires "clear and unequivocal language" to disclaim reliance on the representations of another party. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d 323, 336 (Tex. 2011). In a series of cases, contract language explicitly referencing reliance, "either in terms of relying on the other party's representations, or in relying solely on one's own judgment," has been upheld as sufficient to serve as a release of fraudulent inducement claims as to the

---

[22] The Court will not consider any fraudulent inducement claim with respect to the Amendment here, as Callidus argues, and the Court agrees, that Defendants failed to adequately plead fraudulent inducement as to the Amendment in their Amended Counterclaims. *See* Dkt. No. 91 at 5, Dkt. No. 67 at 9-10.

contracts containing this language. *Id.; see also Allen*, 367 S.W.3d at 368-381 (collecting cases).

The identical clauses in the Jaross and Levy Guaranties in which each guarantor "represents and warrants that he or she has relied exclusively on his or her own independent investigation" in deciding to guaranty ESCO's debt seem, superficially at least, to satisfy this "disclaimer-of-reliance" standard. *See* Dkt. No. 69, Exs. 1, 2 ¶16. These clauses, for instance, reference the Guarantors' 'exclusive' 'reliance' on their own investigations of ESCO, and state that each Guarantor "agrees that he or she has sufficient knowledge of [ESCO] and the collateral to make an informed decision about this Guaranty, and that Lender has no duty or obligation to disclose any information in its possession or control about Borrower and the collateral to [each] Guarantor." *Id.* Yet they disclaim only those representations made by Callidus with respect to ESCO and its financial condition and collateral; they do not act as "all-embracing disclaimer[s]" as to "any representations or omissions" made by Callidus. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 58 (Tex. 2008). Further, the Guaranties were signed concurrently with the Original Agreement, and were not designed primarily as releases or settlements of disputed claims.[23] This places them in contrast with prominent Texas cases finding fraudulent inducement claims barred on the basis of disclaimer-of-reliance clauses. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex. 1997); *Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 61 (Tex. 2008). In particular, where an agreement "is the initiation of a business relationship," Texas contract law holds that it "should be all the more clear and unequivocal in effectively disclaiming reliance and precluding a claim for fraudulent inducement, lest we 'forgive intentional lies regardless of context.'" *Italian Cowboy*, 341 S.W.3d at 335 (quoting *Forest Oil,* 268 S.W.3d at 61).

Having established that Defendants' fraudulent inducement claims are not per se barred according to the terms of the Jaross and Levy Guaranties, the Court

---

[23] The fact that Callidus included specific release and ratification language in the Amendment, following a dispute between the parties over their obligations under the Original Agreement, only serves to underscore this point.

turns to the substantive issue of whether Defendants have raised sufficient fact issues on each element of fraudulent inducement as to the Original Agreement to survive summary judgment. Defendants' primary misrepresentation claims allege that Callidus represented to them that personal guaranties would not be required to close a deal with ESCO, that the deal would close quickly, that the Facility F Loan would be funded through the Original Agreement, and that Callidus would loan 80-85% of the value of inventory and receivables under Facility Loan A pursuant to the Original Agreement. *See* Dkt. Nos. 67, 88; Dkt. No. 88-1, R. Jaross Aff.. First, the Court finds here that any misrepresentations made by Callidus to Defendants with respect to personal guaranties and the timing of the deal cannot, standing alone, serve as the basis for a fraudulent inducement claim. Clearly, Defendants could not have relied on any such misrepresentations by the time they signed the Jaross and Levy Guaranties. Yet the Court finds that Defendants have raised a sufficient fact issue as to whether Callidus's alleged failure to fully fund Facility Loan F and Facility Loan A under the Original Agreement might, in concert with other circumstantial evidence, establish its fraudulent intent.

"Mere failure to perform contractual obligations as promised does not constitute fraud but is instead a breach of contract." *Kevin M. Ehringer Enterprises, Inc. v. McData Services Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Spoljaric,* 708 S.W.2d at 435.) Yet a breach of contract can still "be actionable as fraudulent inducement" when "coupled with a showing that the promisor never intended to perform under the contract." *Id. (citing Spoljaric,* 708 S.W.2d at 434). As "intent to deceive or defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Id.; see also Tony Gullo Motors, I, L.P. v. Chapa* 212 S.W.3d 299 (Tex. 2006) ("[W]hile breach alone is no evidence of fraudulent intent, breach combined with 'slight circumstantial evidence' of fraud is enough to support a verdict for fraudulent inducement.") Further, "[a]lthough a party's intent to defraud is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113,

125 (Tex.App.–Houston 2003, no pet.) "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric*, 708 S.W.2d at 434.

Defendants cite to material in the summary judgment record that establishes a genuine dispute of material fact as to whether Callidus breached the Original Agreement with respect to the transfer of funds under the Facility F Loan, and the calculation of the maximum possible loan available to ESCO under the Facility A Loan. For instance, Guarantor R. Jaross states in his affidavit provided by Defendants that, in addition to Callidus's failure to advance "$3,500,000 under Term Facility F" pursuant to the Original Agreement, Callidus never met its obligation to fully fund the revolving Facility A Loan the contract provided for:

> In addition to the term advances, the Loan Agreement also included a revolving credit line, Facility A, which was tied to the value of the inventory and receivables. The Loan Agreement called for [Callidus] to loan 80-85% of the value of inventory and receivables. However, [Callidus] refused to comply with its own agreement, failing to ever advance 80-85%, instead only advancing 65% of inventory and receivables value, further shorting ESCO's working capital position.
> Dkt. No. 88-1 at ¶ 15, Aff. of R. Jaross

Affidavit evidence of this breach alone is not enough for Defendants' fraudulent inducement claim to survive summary judgment. But Defendants also introduce summary judgment evidence in support of their claims that Callidus never intended to perform under the Original Agreement. Namely, they submit an internal "Credit Approval Memorandum" signed by Callidus management on June 27, 2014—days before the execution of the Original Agreement—in which the percentage of the value of certain inventory Callidus represents it will advance under Facility Loan A is listed as 65-85% of receivables, not 80-85%, as section 3(d) of the Original Agreement requires. Dkt. No. 109 at 21 (Callidus 0096813). Defendants also submit email correspondence sent by former Callidus Vice President Craig Boyer to Guarantor Levy on October 17, 2014—months after the Original Agreement was signed—in which Boyer communicates to Levy that the lower of these percentages was "always supposed to be 65%." Dkt. No. 88-5 (Callidus 0089008). Texas courts considering fraud claims "have held a party's

denial that he ever made a promise is a factor showing no intent to perform when he made the promise." *Spoljaric*, 708 S.W.2d at 435. Taken together, therefore, Boyer's email and the internal Callidus memorandum Defendants provide could support an inference that Callidus never intended to honor the 80-85% calculation represented in the Original Agreement. As this calculation directly affected the maximum loan available to ESCO under Facility Loan A, a misrepresentation about the calculation of this loan would be material.

Defendants have established that a genuine dispute of material fact exists as to each element of fraudulent inducement. Regarding any material representation made by Callidus, Defendants cite to the affidavits of R. and E. Jaross and Levy, who state that Callidus's contractual promises and subsequent verbal assurances of performance on the Original Agreement (and then the Amendment) were misrepresentations.[24] *See* Dkt. Nos. 88-1, Aff. of R. Jaross; 88-2, Aff. of E. Jaross and 88-3, Aff. of Levy. As to whether Callidus knowingly made false representations, Defendants cite to the internal Callidus memorandum and Boyer email that raise fact issues as to whether Callidus intended to perform under the Original Agreement. Regarding whether Callidus intended Defendants to rely on its representations, the terms of the Original Agreement and verbal assurances made to ESCO about Callidus's interest in ESCO's continued profitability were clearly meant to be relied on by ESCO and the Jaross and Levy Guarantors, while the Guarantors have stated they did indeed rely on Callidus's representations in committing to personally guarantee ESCO's debt. *See* Dkt. Nos. 88-1, Aff. of R.

---

[24] While not all representations were uniformly made directly by Callidus to individual Guarantors, under Texas law "fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance." *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2011). Here, Guarantors R. Jaross, E. Jaross, and Levy all state in affidavits that Callidus was aware Defendants were sharing its representations regarding the Original Agreement and Guaranties with each other as these documents were negotiated. *See* Dkt. Nos. 88-1, Aff. of R. Jaross at ¶ 25; 88-2, Aff. of E. Jaross at ¶ 3; and 88-3, Aff. of Levy at ¶ 26. For instance, R. Jaross states: "While Callidus may not have made every representation directly to me, I received such information and relied on it. At various times I communicated Callidus's representations to Andrew Levy and Elka Jaross, as part of the course of dealing with Callidus. Callidus knew I was sharing their representations with Mr. Levy and Mrs. Jaross." Dkt. No. 88-1, Aff. of R. Jaross at ¶ 25.

Jaross at ¶ 25; 88-2, Aff. of E. Jaross at ¶ 3; and 88-3, Aff. of Levy at ¶ 26. Finally, Defendants establish that their alleged injuries, including their alleged liability on the Guaranties themselves, were caused by their reliance on Callidus's representations. Dkt. No. 67 at 9-10; Dkt. No. 88-1, Aff. of R. Jaross at ¶¶ 27, 28; Dkt. No. 88-2, Aff. of E. Jaross at ¶¶ 19, 20; Dkt. No. 88-3, Aff. of Levy at ¶¶ 27, 28. Accordingly, the Court finds that Defendants have provided more than a "scintilla" of evidence extrinsic to the contract itself that raises a genuine dispute of material fact as to whether Callidus fraudulently induced Defendants to sign the Original Agreement and Guaranties sufficient for this claim and affirmative defense to survive summary judgment. *See In re Perry*, 423 B.R. 215, 283 (Bkrtcy. S.D. Tex. 2010).

### 2. Economic Duress

"Economic duress occurs when one party takes unjust advantage of the other party's economic necessity or distress to coerce the other party into making an agreement." *In re RLS Legal Solutions,* LLC, 156 S.W.3d 160, 163 (Tex.App.–Beaumont 2005, no pet.) "The elements of economic duress are: (1) a threat to do something that a party has no legal right to do; (2) illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection." *ABB Kraftwerke,* 115 S.W.3d at 294 (citing *King v. Bishop,* 879 S.W.2d 222, 223 (Tex.App.–Houston 1999, no pet.); *see also Schlotsky's, Ltd. v. Sterling Purchasing and Nat. Distribution Co., Inc.*, 520 F.3d 393, 404 (5th Cir. 2008). The Texas Supreme Court has "characterized duress as the result of threats which render persons incapable of exercising their free agency and which destroy the power to withhold consent." *Dallas County Comm. College Dist. v. Bolton,* 185 S.W.3d 868, 877 (Tex. 2005). It serves as a defense to the enforcement of a contract. *In re RLS,* 156 S.W. at 163. "However, a contract will not be invalidated when the duress emanates from a third person who has no involvement with the opposite party to the contract." *King,* 879 S.W.2d at 224; *see also MCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 91, n.1 (5th Cir. 1995)

(citing the requirement that a party show its financial distress was caused by its partner in contract as an element of economic duress under Texas law.)

Defendants allege that the Original Agreement, Guaranties, and the Amendment were all signed under coercive economic pressure. Dkt. No. 67 at 15. Callidus responds that no agreement between the parties can be invalidated on this theory, as at all times "Defendants' free agency was not destroyed and they had a present means of protection." Dkt. No. 91. As to the Original Agreement, the Court finds that Defendants cannot avail themselves of an economic duress counterclaim or affirmative defense. Defendants admit that ESCO was in immediate need of funding when it initiated talks with Callidus because its prior lender cut off the company's flow of funds. Dkt. No. 29, Ex. A at ¶ 3. It was this prior lender, not Callidus, that put pressure on ESCO to identify a new source of financing, and its suit against ESCO for foreclosure that lent new urgency to ESCO's negotiations with Callidus. *See* Dkt. No. 88, Dkt. No. 29-1. Moreover, Callidus was well within its legal rights to negotiate the terms of the Original Agreement with ESCO and the Jaross and Levy Guarantors, including by delaying its execution and insisting on personal guarantees as a condition of lending. Prior to the execution of the Original Agreement and Guaranties, the parties had signed only a term sheet that did not bind Callidus to anything but the completion of a due diligence review in advance of a possible loan agreement with ESCO. *See* Dkt. No. 88-3 ("If this term sheet is acceptable to you we will commence with the completion of our due diligence review immediately on receipt of the signed copy of this term sheet together with the deposit as detailed below.") For all of these reasons, the Court finds that Defendants cannot avail themselves of an economic duress counterclaim or affirmative defense as to the Original Agreement.

Similar considerations preclude Defendants from proceeding with an economic duress counterclaim or affirmative defense with respect to the Amendment. Defendants claim that Callidus "had no legal right to continually and repeatedly refuse to advance amounts required under the Loan Agreement," Dkt. No. 88 at 33, and that ESCO, and by extension Defendants, would have faced

extreme financial consequences if they had failed to sign the Amendment, Dkt. No.
88 at 17, n.6. Yet even though Defendants have identified a dispute of material fact
as to Callidus's obligations under the Original Agreement, Defendants have not
cited to material in the record to sufficiently support their claim that any such
breach 'imminently restrained' them or 'destroyed their free agency'. *See ABB
Kraftwerke*, 115 S.W.3d at 294. Indeed, Defendants have not suggested or
substantiated a claim that they had no reasonable alternative to signing the
Amendment, such as filing suit against Callidus for breach of the Original
Agreement. *See id.* at 505; *McCallum*, 66 F.3d at 93; *see also Palmer Barge Line,
Inc. v. Southern Petroleum Trading Co., Ltd.*, 776 F.2d 502, 506 (5th Cir. 1985)
(holding that the existence of an agreement negotiated between parties represented
by counsel is strong evidence that no duress in fact existed).

### 3. Unconscionability

"Under Texas law, the party asserting unconscionability of contract bears the
burden of proving both the substantive unconscionability and the procedural
unconscionability of the contract at issue." *American Stone Diamond, Inc. v. Lloyds
of London*, 934 F. Supp. 839, 844 (S.D. Tex. 1996). Procedural unconscionability
arises at contract formation, and relates to the ability of one party to bargain freely
and fairly, while substantive unconscionability restrains parties' abilities to enter
into contracts that are so one-sided they are patently unreasonable. *Lindemann v.
Eli Lilly and Co.*, 816 F.2d 199, 203 (5th Cir. 1987). In Texas, "[u]nconscionability
has been found when there is a 'gross disparity in the values exchanged' and the
'grounds for substantive abuse [are] sufficiently shocking or gross to compel the
court to intercede.'" *Besteman v. Petcock*, 272 S.W.3d 777, 789 (Tex.App.–Texarkana
2008) (quoting *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex.App.–Waco
2005, pet. denied)). "The principles of unconscionability do not negate a bargain
because one party to the agreement may have been in a less advantageous
bargaining position." Instead, "[u]nconscionability principles are applied to prevent
unfair surprise or oppression." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678
(Tex. 2006). "The ultimate question of unconscionability of a contract is one of law,

to be decided by the court." *Ski River*, 167 S.W.3d at 136 (Tex.App.-Waco 2005, pet. denied).

Defendants claim that the Original Agreement are that it was procured through economic duress; that it placed a lien on ESCO's assets; that it placed loans funds into a blocked account controlled by Callidus; and that it was a demand loan. Dkt. No. 88 at 36-37. Defendants' claim as to economic duress cannot lie, as the Court here has granted Callidus's instant summary judgment motion as to this counterclaim and affirmative defense. Thus Defendants have no procedural unconscionability claim with respect to the Original Agreement. Neither are the remainder of Defendants' claims with respect to the substantive unconscionability of the Original Agreement availing. Simply put, Defendants do not cite to any material or even argument suggesting that, given their commercial backgrounds and ESCO's particular financing needs, any of the aspects of the Original Agreement they object to is "so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re Palm Harbor Homes*, 195 S.W.3d at 678.

Defendants' claims with respect to the Amendment are equally infirm. With respect to procedural unconscionability, Defendants allege that "they had no choice but to sign the First Amendment in order to prevent their own financial ruin." Dkt. No. 88 at 36. Defendants allege that Callidus "at the last possible moment" forced them to sign the Amendment, knowing that ESCO was in dire financial condition due to Callidus's alleged failure to advance loans required by the Original Amendment needed to purchase the USS Shenandoah and Yellowstone. *See* Dkt. No. 88 at 17. However procedural unconscionability also focuses on whether unequal bargaining power, a lack of access to counsel, and a lack of negotiation in coming to agreement force a disadvantaged party into an unacceptably one-sided contract. *See Ski River*, 167 S.W.3d at 137-38. There is no evidence in the summary judgment record that Defendants were ignorant of the terms proposed by the Amendment, that they lacked counsel in their negotiations with Callidus, or that they were without power to decline to sign the Amendment. Neither does the

Amendment as a whole suffer from substantive unconscionability. Defendants object in particular to a "usurious $900,000 fee" the Amendment required ESCO to pay, which has since been refunded by Callidus, *see* Dkt. No. 88-9, and in any case could simply be struck without invalidating the entire Amendment on substantive unconscionability grounds. They also object to the fact that the Amendment contains a "litany of variables and terms and conditions" and purports to make loans it authorized discretionary, but do not substantiate why these terms are so patently one-sided and unreasonable as to vitiate the Amendment. The Court therefore finds that Defendants' unconscionability counterclaims and affirmative defenses are unavailing as to both the Original Agreement and the Amendment.

### v. ESCO's bankruptcy and the issue of derivative claims

Callidus additionally argues that Defendants' fraudulent inducement and breach of contract counterclaims are derivative of ESCO's claims resolved in bankruptcy, and are for this reason impermissible.[25] *Id.* Defendants, who were non-debtor parties uninvolved in their personal capacities in ESCO's bankruptcy proceedings, respond that they have "alleged, and shown by affidavit proof, personal loss of income and damage to the business reputation, each of which is substantial, personal and not derivative." Dkt. No. 88 at 39.

Under the Bankruptcy Code, a bankruptcy estate consists of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008). "If a cause of action belongs to the

---

[25] To the extent Callidus also asks the Court to find that Defendants are barred from raising the affirmative defenses of fraudulent inducement and breach of contract on the basis that ESCO released these affirmative defenses in bankruptcy, the Court declines to consider this request. Affirmative defenses raised by Defendants in their personal capacity are not causes of action that could, under any set of facts, be "owned by the bankruptcy estate." *See Hern Family Ltd. P'ship v. Compass Bank*, 863 F.Supp.2d 613, 620 (S.D. Tex. 2012); *see also Rucker v. Bank One Texas, N.A.*, 36 S.W.3d 649 (Tex.App.–Waco 2000). Defendants' fraudulent inducement and breach of contract affirmative defenses mirror their counterclaims for declaratory judgment, but the method of addressing these affirmative defenses is through analysis of their legal sufficiency on the merits.

[bankruptcy] estate, then the trustee has exclusive standing to assert the claim." *Schertz–Cibolo–Universal City, Indep. School District v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994). The Bankruptcy Code empowers this authority because a trustee's "actions are designed to benefit the debtor's estate, which ultimately will benefit the debtor's creditors upon distribution." *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bank.N.D.Tex. 1989) Yet "the trustee lacks standing to bring personal claims of creditors. . . [as] personal claims are not property of the estate." *Id.*

"Whether a particular state law cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *In re Educators Group Health Trust*, 25 F.3d at 1284. This inquiry is a matter of law, which "requires the court to 'look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors.'" *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bank.N.D.Tex. 1989) (quoting *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987)). "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." *In re Educators Group Health Trust*, 25 F.3d at 1284. Yet "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct." *In re Seven Seas*, 522 F.3d at 585.

Whether Defendants are precluded from bringing their fraudulent inducement and breach of contract counterclaims depends on whether, under Texas law, ESCO could have brought these claims directly on their behalf. Defendants assert that "as investors and/or shareholders in ESCO," and "as a result of being guarantors," they can "bring claims against Plaintiff for Plaintiff's wrongful actions against ESCO." Dkt. No. 67 at 9. This is true, however, only to the extent that the claims Defendants seek to bring are personal to them, as creditors and Guarantors.

Of their two counterclaims, the Court finds first, that Defendants' breach of contract counterclaim is derivative of any breach of contract claim ESCO might have raised as a debtor in property, and so belonged exclusively to ESCO's bankruptcy estate.[26] The injuries Defendants complain of as a result of Callidus's alleged breach of the Original Agreement—namely, general damages resulting from breach and "loss of compensation from ESCO"—are also derivative of ESCO's injuries. Dkt. No. 67 at 13. Yet the Court finds that Defendants' fraudulent inducement counterclaim is a direct claim that belongs solely to them, not to ESCO's bankruptcy estate. Defendants have adequately pled in their amended counterclaim that Callidus fraudulently induced them, as Guarantors, to personally guarantee ESCO's debt under the Original Agreement, and have identified personal damages they allege they have "suffered as a result of being guarantors to the agreement." Dkt. No. 67 at 11; Dkt. No. 88-1, Aff. of R. Jaross at ¶¶ 27, 28; Dkt. No. 88-2, Aff. of E. Jaross at ¶¶ 19, 20; Dkt. No. 88-3, Aff. of Levy at ¶¶ 27, 28. Further, Callidus has identified no relevant precedent that precludes Defendants from bringing this claim, while a number of cases arising under Texas law have explicitly allowed guarantors and other creditors to proceed with similar, and even identical, claims. *See, e.g.,* *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349 (Tex.App.–Houston 2016); *In re Seven Seas*, 522 F.3d 575; *In re Educators Group Health Trust*, 25 F.3d 1281.

## V.     Conclusion

For the foregoing reasons, the Court:

- **GRANTS** Defendants' Opposed Motion for Leave to File Defendants' Sur-Reply in Opposition to Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 97;

- **GRANTS IN PART AND DENIES IN PART** Defendants' Opposed Motion for Leave to Supplement Evidence in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 108;

---

[26] This is evident on the face of Defendants' amended complaint, which alleges that Callidus breached the Original Agreement while Defendants, "met all conditions precedent for performance of the provisions breached by Plaintiff and committed no breach prior to Plaintiff's breach on the effective date." Dkt. No. 67 at 12.

- **GRANTS IN PART AND DENIES IN PART** Defendants' Objections to Plaintiff's Summary Judgment Evidence, Dkt. No. 87;
- **DENIES** Defendants' Motion to Remove "Attorneys' Eyes Only" Designation from Certain Documents Produced by Plaintiff, Dkt. No. 101; and
- **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment as to Defendants' Amended Counterclaims/Affirmative Defenses and for Partial Summary Judgment as to Count 1 of Plaintiff's Amended Complaint, Dkt. No. 69.

The Court further informs the parties that while this Order is filed under seal in deference to the parties' Agreed Protective Order signed by the Court on December 28, 2016, Dkt. No. 94, it will be unsealed no sooner than ten (10) days following entry of this Order unless prior to this date Callidus files specific objections showing good cause why the Order should remain under seal.

It is so ORDERED.

SIGNED this 30th day of March, 2017.

Hilda Tagle
Senior United States District Judge